STATE OF CONNECTICUT *v.* CAROL MAGNANO
(12519)

PETERS, C. J., SHEA, CALLAHAN, BORDEN and MENT, Js.

Argued March 31—decision released July 7, 1987

*Suzanne Zitser,* assistant public defender, with whom, on the brief, were *Joette Katz,* public defender, and *Kent Drager,* assistant public defender, for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, was *John T. Redway,* state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from a judgment of conviction, after a jury trial, of the crime of murder in violation of General Statutes § 53a-54a (a).[1] The defendant claims that the trial court erred: (1) in refusing to suppress certain photographs taken and diagrams made during a warrantless entry and search of her premises; and (2) in admitting into evidence communications between the defendant and a battered women's counselor in alleged violation of General Statutes § 52-146k (b). We find no reversible error.

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

I

At the suppression hearing the following facts were revealed. On October 13, 1982, three Middletown police department patrol officers, Sergeant Ralph Ward, Officer Jerry Artikes and Officer Luigi Liistro, were dispatched to the defendant's residence at 3 Woodlot Lane in Middletown in response to a report of a burglary in progress. The defendant had telephoned the police at approximately 3:45 a.m. to report that an intruder had entered her home, that her husband was asleep downstairs, and that she was upstairs with her three children. Ward arrived at aproximately 3:50 a.m. and began to walk around the house. As he was circling the house, he encountered Artikes. Together, they entered the patio, and through an open sliding glass door went into the dining room area of the house. They checked the kitchen, and observed that the cabinet doors were open and that the room was in disarray. They entered the living room in response to a noise, and discovered the defendant's husband, James Magnano, lying on a couch, unconscious but alive. An arrow protruded from his left temple, and blood covered the couch, blanket, sheets, pillow and rug. An ambulance was immediately summoned, and thereafter Artikes and Ward proceeded upstairs. They entered two bedrooms, and after noticing a light under a door entered a third bedroom where they found the defendant and her three children. Liistro, who had by now arrived on the scene, stayed with the defendant and her children while Ward and Artikes conducted a thorough search of the rest of the house for the presence of an intruder. By this time, the officers had concluded, from the condition of the house and the assault on James Magnano, that a burglary had taken place. The officers also concluded after this search that the intruder was no longer on the premises.

The defendant was informed that her husband had been injured and was being taken to the hospital. She was advised to call someone to take her to the hospital. She called her brother-in-law, Robert Magnano, who arrived about 4:15 a.m. Meanwhile, the ambulance had already arrived for the victim. The defendant and her three children left with Robert Magnano for his house. It is undisputed that at this time the defendant was not a suspect in the assault. It is also undisputed that by the time the defendant had left the premises, the emergency had terminated since the premises had been searched and secured and the victim was on the way to a hospital, where he later died.

The detective squad had been notified of the incident at 3 Woodlot Lane because it was standard operating procedure for it to conduct the investigation and process various items. Shortly after the defendant left, members of the detective squad began arriving on the scene. Sergeant Ronald Lee was the first to arrive, at approximately 4:25 a.m. His arrival was closely followed by those of Captain Salvatore Faraci, who was in charge of the investigation, and by Sergeant Robert Clayton. Faraci assigned Lee as the evidence officer, whose primary task was to take evidence into custody. Faraci assigned Clayton as the photography officer. Pursuant to these duties, the officers accompanied Ward as he reenacted his movements and recollected his observations from the moment of his arrival on the scene to his discovery of the defendant and her three children in the room upstairs, and thereafter during his search for intruders on the premises. The items which Ward observed in plain view were photographed[2]

---

[2] The only items of evidence at issue on this appeal are certain photographs taken by Lee and Clayton of items and scenes observed by the initial officers who entered the premises, and certain diagrams incorporating measurements. The admission of the physical evidence depicted in the photographs is not under attack. The photographs in dispute depict a crossbow and a can of soda, both lying on the ground outside the house; a cedar

and taken into custody by the detectives. Additionally, either Lee or Clayton took photographs of various interior and exterior areas of the house, including the dinette and kitchen areas, and took measurements for the purpose of diagramming the crime scene. The photographs were taken between 4:40 and 6:30 a.m., although upon discovery that Clayton's photographs would be unusable because of a camera malfunction, replacement pictures were taken sometime prior to 10 a.m. Ward, Artikes and Liistro, the initial responding officers, left the defendant's house soon after the arrival of the members of the detective squad. By 10 a.m., all police officers had left the house.

The defendant filed a motion to suppress the evidence taken into custody by the detectives, claiming that it had been seized pursuant to a warrantless search which fell within none of the exceptions to the search warrant requirement. Specifically, the defendant sought to suppress tangible evidence, photographs of the interior and exterior of the premises as they appeared to the patrol officers on their initial entry, and sketches which incorporated measurements taken by Lee.

The trial court, *Hale, J.,* granted the motion in part. Of relevance to this appeal is the following order: "Motion granted as to any pictures taken at the scene on October 13, 1982, by the detectives and any diagrams or sketches made by them from measurements or observations taken at the scene by them." In granting this part of the motion to suppress, the trial court rejected the state's argument that the search fell within the consent exception to the warrant requirement.[3] The

box, roach clip holder, rolling paper and a vitamin bottle with plant-like material on the dining room table; and bloodstained pillows, sheets and an aqua blanket on the couch where the victim was found. Additionally, there were photographs of various interior and exterior areas, including the dinette and kitchen areas, and the patio.

[3] Our disposition of this appeal renders it unnecessary to consider the propriety of this aspect of the trial court's ruling.

court also rejected the application of the emergency or exigency exception to the search warrant requirement articulated in *Mincey* v. *Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). The court reasoned that *Mincey* v. *Arizona,* supra, justified the admission of tangible evidence observed in the plain view of the responding officers, and that the legality of the seizure was not affected by the fact that the officers left it in place for processing by the detective squad. The court held, however, that once the premises had been secured, a search warrant was required for further seizures and, therefore, any photographs or diagrams incorporating measurements which were taken without a warrant must be suppressed.

The state requested and was granted permission to reargue the motion with respect to this ruling. After reargument, the court modified its earlier ruling, and permitted the state to introduce photographs taken and diagrams made by the detectives which depicted the plain view observations of the responding officers. The court reasoned: "[T]o the extent that the second group of officers enter upon the scene and do no more than the first group of officers would have been justified in doing, secure evidence in plain view and not expand the scope or nature of the original entry, the fruits of that action should be admissible. . . . [T]he Court finds that the motion to suppress photographs and diagrams or sketches taken by or made by detectives who arrived on the scene after the property had been secured, is denied, but only insofar as evidence indicates that those photographs, diagrams and sketches depict evidence on the scene as it was in the plain view of the uniformed officers who first came on the scene." As a result of this modified ruling, certain photographs, depicting evidence and the interior and exterior areas of 3 Woodlot Lane, and diagrams, incorporating measurements taken by Lee, were admitted into evidence. See footnote 2, supra.

The defendant claims that the court erred in modifying its original order, and that the photographs and diagrams were seized in violation of the fourth and fourteenth amendments to the United States constitution and article first, § 7, of the Connecticut constitution.[4] Specifically, she claims that while the exigency or emergency exception to the search warrant requirement articulated in *Mincey* v. *Arizona,* supra, justified the initial entry of the responding officers, the limited search to secure the premises and the seizure of evidence in plain view, it did not justify the subsequent warrantless entry and search by the detectives after the emergency was terminated, the premises had been adequately secured, and the defendant had left the premises. Therefore, she claims, the photographs and diagrams arising from that illegal search should be suppressed. The state responds that the court's modified ruling was consistent with the doctrine enunciated in *Mincey* v. *Arizona,* supra, and its progeny, and constituted a finding that the reentry of the detectives was a mere continuation of the original legal entry of the responding officers. Therefore, the state claims, the detectives were permitted to seize evidence and memorialize it by photographs and diagrams so long as it coincided with the plain view observations of the responding officers. We agree with the state.

It is clear that " 'a search conducted without a warrant issued upon probable cause is *"per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." ' *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), quoting *Katz* v. *United States,* [389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)]." *State* v. *Zindros,* 189 Conn. 228, 236–37, 456 A.2d 288

---

[4] Since the defendant has not provided us with a separate analysis of her claim under the Connecticut constitution, we decline to address it separately. See *State* v. *Braxton,* 196 Conn. 685, 688 n.2, 495 A.2d 273 (1985).

(1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). A recognized exception to the warrant requirement is relevant to this case, namely, the exception for searches conducted pursuant to exigent or emergency circumstances. *Thompson* v. *Louisiana,* 469 U.S. 17, 105 S. Ct. 409, 83 L. Ed. 2d 246 (1984), reh. denied, 469 U.S. 1197, 105 S. Ct. 981, 83 L. Ed. 2d 1983 (1985); *Mincey* v. *Arizona,* supra; *Michigan* v. *Tyler,* 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978); *State* v. *Zindros,* supra.

In *Mincey* v. *Arizona,* supra, the United States Supreme Court recognized the exigency or emergency exception to the warrant requirement. The court held that the fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. Id., 392–93. The extent of the search is limited, involving "a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." Id., 392. The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. Id., 393. Such a search is strictly circumscribed by the emergency which serves to justify it; id.; and cannot be used to support a general exploratory search.

The defendant concedes that the initial entry by the patrol officers, in response to the defendant's call for help, was a legal entry under the emergency exception of *Mincey* v. *Arizona,* supra, and that evidence discovered in plain view by the patrol officers was admissible. The defendant does not claim error in the trial court's ruling to admit such tangible evidence, even though it was seized by the detectives who reentered the premises after they had been secured. The defendant argues, nonetheless, that this reentry, which

resulted in the introduction into evidence of, inter alia, the photographs and diagrams, was an illegal entry[5] not justified by *Mincey* v. *Arizona,* supra, since the emergency had abated and the premises had been secured.

We conclude that when a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. Under such circumstances, it is permissible for the detectives to photograph and take measurements, without a search warrant, of evidence which was in the plain view of the initial responding officers. This conclusion is in conformity with decisions in other jurisdictions which have considered the issue, furthers the goal of effective law enforcement, and promotes the rationale and purpose of the plain view doctrine.

Our review of case law in other jurisdictions which have considered this issue in similar factual contexts lends overwhelming support to this conclusion. We note

---

[5] The defendant argues in her reply brief that the trial court at all times characterized the reentry as an illegal entry and that this finding was not affected by the court's later modification of its ruling. As a consequence of this, she claims that the state's theory that the detective's presence was a "mere continuation" of the legal entry is internally flawed because the trial court found that their presence was at all times illegal. We disagree with the defendant's characterization of the trial court's ruling. We note first that the defendant, in her initial brief, described the trial court's modification as a finding that the second entry of the detectives constituted a mere continuation of the initial legal warrantless entry. Additionally, we view the trial court's modification, to the extent that it authorizes the second group of officers on the scene to do no more than the first group of officers could legally do, as constituting an implicit finding that their presence was a mere continuation of the earlier legal entry and, consequently, an implicit revision of its earlier factual finding that their presence was illegal.

initially the ultimate disposition of *Mincey* v. *Arizona,* *supra,* on remand from the United States Supreme Court to the Arizona court. In *Mincey* v. *Arizona,* 130 Ariz. 389, 636 P.2d 637 (1981), several police officers staked out an apartment where a narcotics sale had been set up. The lead officer had previously been in the apartment in an undercover capacity and had arranged a drug sale. This officer rushed into Mincey's apartment and then into his bedroom. A volley of shots was heard. The other officers forced their way into the apartment and witnessed their brother officer emerge from the bedroom and collapse from a gunshot wound. He eventually died. The officers thereafter rushed into Mincey's bedroom where they found him, also suffering from gunshot wounds.

About ten minutes after the initial entry by the officers in response to the shooting, homicide detectives arrived and took charge of the investigation. Detective Reyna, two identification technicians and a graphic art specialist were among the group of law enforcement officers who entered the apartment. Without benefit of a search warrant, they began to photograph, film and diagram the contents of the apartment, but memorialized at that point only the plain view observations of the initial responding officers. Soon thereafter, all personnel left the apartment, but detectives returned some hours later to conduct a search which lasted for four days.

The defendant moved to suppress all evidence seized by Reyna. The Arizona Supreme Court held that Reyna's entry in response to the emergency was a continuation of the responding officers' original entry. The court stated: "We also decline to separate, as appellant would have us do, the entry of Detective Reyna and the homicide squad from that of the [police officers] and further decline to find that their presence and activities were not part of the emergency. As has been

stated the [police officers] were precluded from conducting their own investigation by police department policy. The evidence at the second trial showed also that Detective Reyna arrived and began his investigation only a short time after the shooting and while the [police officers] were still on the premises. . . . [W]e believe that Reyna's entry was merely a continuation of the initial emergency entry of the [police officers]. Reyna was, therefore, lawfully present during the emergency and could make plain view seizures during that time of evidence he observed in plain view." Id., 401.

In *People* v. *Reynolds,* 672 P.2d 529, 531 (Colo. 1983), another case that supports our conclusion, police officers responded to a call from the defendant's stepdaughter reporting that shots had been heard from the defendant's premises. When the officers arrived at the house, the defendant met them at the door and let them in. Thereafter, they located the body of the defendant's wife in a bedroom and arrested the defendant. The officers searched the rest of the house to determine if there were other victims or suspects. They observed in plain view an empty liquor bottle, a revolver and certain notes. One and one-half hours later, officers from the criminal investigation laboratory arrived to photograph and videotape these items and to take extensive measurements for preparation of diagrams of the murder scene.

The defendant moved to suppress the evidence, and the sole issue on appeal was remarkably similar to the issue in the present case, namely, whether the fourth amendment required the police to obtain a search warrant before they could photograph, videotape or diagram evidence otherwise admissible under the plain view exception. Id. The court held: "A search warrant is not required where evidence discovered in plain view is seized as part of a continuing police investigation. . . . In our view, photographing the evidence,

and recording the relevant crime scene dimensions approximately one hour and a half after discovery was part of an on-going lawful criminal investigation and did not require a search warrant." Id., 533; see also *State* v. *Johnson,* 413 A.2d 931, 934 (Me. 1980), aff'd, 434 A.2d 532 (Me. 1981); *Smith* v. *State,* 419 So. 2d 563, 568–74 (Miss. 1982); *State* v. *Jolley,* 321 S.E.2d 883, 886–87 (N.C. 1984); *State* v. *Anderson,* 42 Or. App. 29, 599 P.2d 1225, 1229 (1979), cert. denied, 446 U.S. 920, 100 S. Ct. 1857, 64 L. Ed. 2d 275 (1980); *State* v. *Eacret,* 40 Or. App. 341, 345, 595 P.2d 490 (1979); *La Fournier* v. *State,* 91 Wis. 2d 61, 70, 280 N.W.2d 746 (1979). These cases establish the proposition that whether a subsequent entry is deemed to be detached from the initial emergency which justifies the warrantless intrusion or is a mere continuation of the intrusion depends on the facts and circumstances of each case. *La Fournier* v. *State,* supra.

In this case, the initial officers responded to the defendant's call that an intruder was in the house. During the course of the response they legitimately searched and secured the premises, observing items of evidence in plain view. Pursuant to department policy, they did not attempt to take any evidence into custody. The detectives arrived on the scene only thirty-five minutes after the responding officers' initial entry and while they were still on the premises. They proceeded to process evidence and to take photographs and measurements. Finally, the intruder was still unknown and at large, and the investigation had not focused on any particular individual. We conclude that under the facts of this case, the initial entry of the patrol officers and subsequent entry of the detectives were analytically inseparable, and that the later entry was a mere continuation of the earlier legal entry. As such, the photographs and measurements depicting the plain view observations of the patrol officers who had responded to the emergency were admissible.

This conclusion is also supported by sound policy and by fourth amendment theory. It is a reasonable and logical procedure for experienced law enforcement personnel to process evidence at crime scenes. The purpose is to promote careful preservation of evidence and to permit a complication-free chain of custody. The promotion of more accurate evidence gathering serves the legitimate interests of all parties. Our conclusion in this case serves to further this reasonable practice.

Furthermore, our conclusion is consistent with the rationale and purpose of the plain view doctrine. In *Coolidge* v. *New Hampshire,* 403 U.S. 443, 467–68, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971), the United States Supreme Court stated: "Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it." The same rationale applies to the claim that a search warrant is required to photograph evidence which is properly in plain view. Moreover, the defendant cannot be heard to complain that the second entry into the premises by the detectives affected her privacy interests. As the United States Supreme Court stated in *Illinois* v. *Andreas,* 463 U.S. 765, 772, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983), "[t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy."[6]

---

[6] The defendant also suggests that the plain view doctrine enunciated in *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), permits the seizure of items observed in plain view, but does

## II

The defendant next claims that the trial court erred when it permitted the state, in its case-in-chief, to introduce communications between the defendant and her counselor at a battered women's shelter. The defendant claims that these communications were privileged under General Statutes § 52-146k.[7]

In order to address this issue, we must put it in its historical context. On September 13 and 14, 1982, the defendant communicated with various personnel at the New Horizons Shelter (shelter), a facility in Middletown for battered and abused women. In those communications, the defendant described herself as the victim of physical and mental abuse at the hands of her husband. One month later, on October 13, 1982, as previously indicated, the defendant's husband was wounded by a crossbow, and died a few days later. On January 27,

---

not contemplate memorializing those observations by use of a camera and measuring equipment. *Coolidge* v. *New Hampshire,* supra, does not support this proposition, and the defendant has failed to cite any case law which so limits the plain view doctrine. The plain view doctrine is quite broad enough to encompass photographing and measuring items in plain view. See *People* v. *Reynolds,* 672 P.2d 529, 532–33 (Colo. 1983); *Commonwealth* v. *Young,* 382 Mass. 448, 458–59, 416 N.E.2d 944 (1981). Indeed, it is difficult to see why the defendant's privacy interest would be unprotected against a plain view seizure, but protected against the less intrusive measure of a plain view photograph or diagram.

[7] General Statutes § 52-146k provides in relevant part: "(b) On or after October 1, 1983, a battered women's counselor or a sexual assault counselor shall not disclose any confidential communications made to such counselor at any time by a victim in any civil or criminal case or proceeding or in any legislative or administrative proceeding unless the victim making the confidential communications waives the privilege, provided under no circumstances shall the location of the battered women's center or rape crisis center or the identity of the battered women's counselor or sexual assault counselor be disclosed in any civil or criminal proceeding. Any request made on or after October 1, 1983, by the defendant or the state for such confidential communications shall be subject to the provisions of this subsection."

1983, a grand jury was convened, pursuant to General Statutes § 54-45 (a), regarding the death of James Magnano. During the course of this proceeding, the state subpoenaed Nancy Archer, a counselor at the shelter, to appear before the grand jury with certain records concerning the defendant. The shelter moved to quash the subpoena, claiming that the communications between a counselor and a client were privileged. The court, *Spallone, J.*, denied the motion, and Archer testified before the grand jury. Thereafter, on January 28, 1983, the grand jury returned a true bill of indictment charging the defendant with murder.

The ruling by Judge Spallone to admit the communications between the counselor and the defendant led to the promulgation of Public Acts 1983, No. 83-429, subsequently codified as General Statutes (Rev. to 1985) § 52-146k.[8] The statute provided in part that "[a] battered women's counselor or a sexual assault counselor shall not disclose any confidential communications

---

[8] Numerous references during testimony on the bill concerning privileged communications were made to the grand jury proceedings held before Judge Spallone. For example, Mark Masselli, executive director of the Community Health Center in Middletown, which operates the New Horizon Shelter, testified: "Although we have always been aware generally of the need for privileged communication in this regard, we experienced rather compelling, firsthand reasons earlier this year, when a resident of our shelter had claimed 'privileged communication' during a Grand Jury investigation into her husband's death, when the Court subpoenaed the file pertaining to her stay at the shelter.

"While there existed no state statute granting confidentiality, we at the Health Center felt an obligation to resist making public any information which we felt should remain confidential. . . .

"Our Motion to Quash the Subpoena cited the need for confidentiality . . . . In overruling the Motion to Quash, the Judge cited the lack of state statute. . . .

"As Judge Spallone, in our case, stated in recognizing the need for confidentiality for shelters and I quote: 'Obviously this operation [New Horizons Shelter] operating under privileges is going to operate better. There is no question in my mind, no question in any intelligent person's mind, it is going to work better.' He also suggested that if there is a need for that kind of privilege then you should go to the state legislature and try to get it passed."

made to such counselor by a victim in any civil or criminal case or proceeding or in any legislative or administrative proceeding unless the victim making the confidental communications waives the privilege . . . . '' The effective date of Public Acts 1983, No. 83-429, was October 1, 1983.

On December 6, 1983, after the effective date of General Statutes (Rev. to 1985) § 52-146k (b), the defendant's trial began. On December 15, 1983, during the state's case-in-chief, the state called Archer as a witness. The defendant objected, claiming that the newly enacted statute protected her communications with personnel at the shelter and could not be disclosed without a valid waiver. The court, *Hale, J.,* concluded that the statute was not applicable to the defendant's communications because they were made in September, 1982, *before* the effective date of the act. The court overruled the defendant's objection, and Archer's testimony was admitted.

Archer disclosed that she had met with the defendant and admitted her to the shelter. She further testi-

Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1983 Sess., pp. 1725–27; see also id., p. 1637, remarks of Charlotte Kinlock, and p. 1728, remarks of Margaret Levy.

Although there is earlier authority to the contrary; see, e.g., *Anderson* v. *Ludgin,* 175 Conn. 545, 554 n.8, 400 A.2d 712 (1978); *Spring* v. *Constantino,* 168 Conn. 563, 571–72 n.4, 362 A.2d 871 (1975); in recent years we have repeatedly approved references to testimony before legislative committees in order to shed light on legislative intent. See, e.g., *Nationwide Ins. Co.* v. *Gode,* 187 Conn. 386, 392 n.6, 395–96, 446 A.2d 1059 (1982); *Tax Commissioner* v. *Estate of Bissell,* 173 Conn. 232, 245, 377 A.2d 305 (1977); *Gentile* v. *Altermatt,* 169 Conn. 267, 290–91, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see also *Board of Education* v. *Bridgeport Education Assn.,* 9 Conn. App. 199, 204 n.3, 518 A.2d 394 (1986), cert. denied, 202 Conn. 802, 519 A.2d 1206 (1987). This is fully consistent with the general principle of statutory construction that we look, in part, to the problem or issue which the legislature sought to resolve, and the purpose it sought to serve, in enacting a statute. *Verrastro* v. *Sivertsen,* 188 Conn. 213, 221, 448 A.2d 1344 (1982). Often that problem, issue or purpose is disclosed by reference to the testimony before a legislative committee.

fied that the defendant left the same day after learning that her husband had been involved in a motorcycle accident, and did not return. During the course of the defendant's admission to the shelter, a number of documents were processed, some of which were introduced into evidence through Archer. These documents contained information about the incident of abuse which had precipitated the defendant's visit to the shelter, namely, that the defendant had had an argument with her husband and that he had banged her head against a washing machine. The documents also revealed that after this incident, the defendant took their children and went to stay with a girlfriend. The documents also contained statements by the defendant that she considered her husband hot-tempered, and that after the first year of marriage she was the victim of mental abuse and, after five years, of physical abuse. They had been married for a total of twelve years.

The defendant was convicted of murder on January 23, 1984, and appealed, raising as a preliminary issue that the trial court violated General Statutes (Rev. to 1985) § 52-146k (b) by admitting the communications between the defendant and her counselor. While this appeal was pending, the legislature enacted Public Acts 1985, No. 85-112, effective October 1, 1985, amending General Statutes (Rev. to 1985) § 52-146k (b). That act stated in part that "ON OR AFTER OCTOBER 1, 1983, a battered women's counselor or a sexual assault counselor shall not disclose any confidential communications made to such counselor AT ANY TIME by a victim in any civil or criminal case . . . . ANY REQUEST MADE ON OR AFTER OCTOBER 1, 1983, BY THE DEFENDANT OR THE STATE FOR SUCH CONFIDENTIAL COMMUNICATIONS SHALL BE SUBJECT TO THE PROVISIONS OF THIS SUBSECTION."

Ten days before the defendant in this case filed her brief, this court decided *State* v. *Lizotte,* 200 Conn. 734, 517 A.2d 610 (1986). In that case, we were presented with the claim that General Statutes (Rev. to 1985) § 52-146k should be interpreted to apply retroactively to communications made prior to October, 1983. In *State* v. *Lizotte,* supra, the defendant sought to prevent the admission of communications between a counselor and her client made prior to the effective date of the statute. The defendant argued that the critical time for determining the applicability of the statute was when the communications were disclosed, not when they were made. We disagreed, and held that where the legislature effects a substantial change in the law, as it did by creating a privilege, "[a]bsent clear and unequivocal legislative intent, § 52-146k should not be applied retroactively." Id., 741–42. In reaching this conclusion, we stated further that "[n]owhere in the statute is there mention that the privilege extends to communications made prior to the effective date of the statute. . . . Moreover, an examination of the legislative history does not reveal any intent that the statute have retroactive effect. We, therefore, will not apply this statute retroactively." Id., 742.

The defendant's brief in *State* v. *Lizotte,* supra, was filed on July 30, 1985, and the state's brief was filed on January 13, 1986. The defendant did not file a reply brief. Neither brief raised the issue of the effect on the defendant's claim of Public Acts 1985, No. 85-112, amending General Statutes (Rev. to 1985) § 52-146k (b). We nonetheless considered that effect. We held that the 1985 amendment reflected a substantive change in the law because it constituted a substantial expansion of the privilege by extending the privilege to communications made before the effective date of the act. Because we viewed the 1985 amendment to effect a substantive change in the law, we did not apply it ret-

roactively, and we concluded that it did not, therefore, affect the trial court's ruling. We therefore applied the law as it was in existence at the time the trial court made its determination. *State* v. *Lizotte,* supra, 738 n.3.

At the time we reached this conclusion as to the effect of the 1985 amendment, we did so without the benefit of full briefs on that issue. Because we were without the benefit of either a crystallization of the issue that naturally evolves out of an adversarial presentation, or the most persuasive legal authority that can be mustered in support of a position, we have decided to reconsider our holding in *State* v. *Lizotte,* supra, as it pertains to the effect of the 1985 amendment on General Statutes § 52-146k (b).

In determining the effect of a subsequent statutory amendment on earlier legislation, we are guided by well defined principles of statutory interpretation. We recognize the usual presumption that, in enacting a statute, the legislature intended a change in existing law. *Shelton* v. *Commissioner,* 193 Conn. 506, 513, 479 A.2d 208 (1984); *Vartuli* v. *Sotire,* 192 Conn. 353, 364 n.12, 472 A.2d 336 (1984); 1A J. Sutherland, Statutory Construction (4th Ed. Sands 1984) § 22.30. This presumption, however, like any other, may be rebutted by contrary evidence of the legislative intent in the particular case. *Shelton* v. *Commissioner,* supra, 513–14.

In determining the intended effect of a later enactment on earlier legislation, two questions must be asked. "First, was the act intended to *clarify* existing law or to *change* it? Second, if the act was intended to make a change, was the change intended to operate retroactively?"[9] (Emphasis added.) *Circle Lanes of Fairfield, Inc.* v. *Fay,* 195 Conn. 534, 540, 489 A.2d 363 (1985).

---

[9] We note that in *State* v. *Lizotte,* 200 Conn. 734, 517 A.2d 610 (1986), we skipped directly to the second question without grappling with the first.

With respect to the first question, namely, whether an act was intended to clarify existing law, or to change it, our recent case of *State* v. *Blasko,* 202 Conn. 541, 522 A.2d 753 (1987), sheds light on the proper analytical approach to follow. In that case, we were faced with the issue of whether Public Acts 1985, No. 85-611, now codified as General Statutes §§ 54-47a through 54-47h, reforming the procedures governing investigatory grand juries, terminated the authority of grand juries that had been duly constituted before the effective date of the public act. We held that while Public Acts 1985, No. 85-611, was silent on this issue, Public Acts 1986, No. 86-317, which was subsequently enacted and which stated that a grand jury instituted prior to the effective date of Public Acts 1985, No. 85-611, shall continue until completion, served to clarify the legislature's original intent under Public Acts 1985, No. 85-611, with respect to this matter. *State* v. *Blasko,* supra, 557. We held that Public Acts 1986, No. 86-317, was a clarifying act and as "a clarifying act, which 'in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act.' *Tax Commissioner* v. *Estate of Bissell,* 173 Conn. 232, 246, 377 A.2d 305 (1977); *State* v. *One 1977 Buick Automobile,* 196 Conn. 471, 479, 493 A.2d 874 (1985); *Circle Lanes of Fairfield, Inc.* v. *Fay,* [supra, 540]; *Neyland* v. *Board of Education,* 195 Conn. 174, 180, 487 A.2d 181 (1985); [*Shelton* v. *Commissioner,* supra, 514]; *Lee* v. *Board of Education,* 181 Conn. 69, 75, 434 A.2d 333 (1980); see 1A J. Sutherland, supra, §§ 22.31, 22.35." *State* v. *Blasko,* supra.

In order to determine whether an act should be characterized as clarifying legislation, we look to the legislative history to determine the legislative intent. Id. In *State* v. *Blasko,* supra, we found support in the legislative history for a conclusion that the legislature, in enacting the amendment, intended to clarify the

original intent of the earlier legislation that grand juries authorized before October 1, 1985, would be authorized to finish their inquiries.[10]

We note that in *State* v. *Blasko,* supra, the legislative history revealed that the amendment to the original statute was precipitated by the trial court ruling that was the subject of the appeal then before us. See footnote 10, supra. In the present case, while the original legislation was passed in direct response to the trial court ruling during this defendant's grand jury proceedings, the subsequent amendment, at least as revealed by the legislative history, does not appear to have been explicitly so influenced. This aspect of *State* v. *Blasko,* supra, which distinguishes it from the present case, is not, however, a precondition to an application of legislation, which becomes effective while a case is pending on appeal, retroactively to that case. On at least two occasions, we have applied to a case on appeal an amendment which we held clarified earlier legislation without requiring that the amendment be a direct response to an actual ruling in that case.

For example, in *State* v. *One 1977 Buick Automobile,* supra, 479, the owner and operator appealed the seizure of their car under the forfeiture statute; General Statutes § 54-33g; for failure of the state to seize the property pursuant to a search warrant as required by

---

[10] We relied on the following comments by Senator Richard B. Johnston: " '[I]t was not . . . our intent to terminate through the passage of that legislation any then initiated and ongoing grand jury investigations.' . . . '[T]his legislation before us really, in essence, provides a clarification to that legislative intent, that is that those grand juries that were initiated prior to the passage of the Public Act last year were lawfully constituted after the passage of that legislation and legitimately ongoing. It was—when Judge Pickett speaks in his ruling on the motion, he speaks of that there was no grandfathering of any then initiated grand jury investigations. Well, I recall thinking . . . that the grandfathering of any already instituted actions [was] provided in other passages of the Connecticut general statutes . . . .' " *State* v. *Blasko,* 202 Conn. 541, 557, 522 A.2d 753 (1987).

the statute and by *State* v. *Sabia,* 1 Conn. App. 315, 471 A.2d 673 (1984). The appellants claimed the seizure was in violation of the statute since it was pursuant to an arrest. We concluded that a 1984 amendment to General Statutes § 54-33g which permitted forfeiture proceedings when property was seized pursuant to an arrest and which was a legislative response to *State* v. *Sabia,* supra, clarified the earlier legislation. We stated: "We view this recent enactment as a legislative declaration of what § 54-33g (c), when read in conjunction with § 54-36a (c) [disposition of seized property on order of examiner of seized property], was originally intended to mean." *State* v. *One 1977 Buick Automobile,* supra, 479.

In *Circle Lanes of Fairfield, Inc.* v. *Fay,* supra, we held that a clarifying amendment which became effective while the case was pending on administrative appeal was applicable even though the amendment was not in direct response to a ruling in that case. There, the plaintiffs appealed to the Superior Court from the decision of the state claims commissioner denying the plaintiffs permission to sue the state for negligence. At the time of that decision, the jurisdiction of the Superior Court to review such a decision had been determined in *Hirschfeld* v. *Commission on Claims,* 172 Conn. 603, 605–608, 376 A.2d 71 (1977), which reconciled two conflicting statutes: General Statutes § 4-164, which prohibited an appeal from the decision of the claims commissioner; and General Statutes § 4-185 of the Uniform Administrative Procedure Act (UAPA), which provided for judicial review of all contested cases decided by "all agencies . . . not expressly exempted." *Circle Lanes of Fairfield, Inc.* v. *Fay,* supra, 538–39. In *Hirschfeld* we construed these statutes together and permitted appeals for limited purposes. After the plaintiffs in *Circle Lanes of Fairfield, Inc.,* filed their appeal to the Superior Court, the legis-

lature enacted Public Acts 1982, No. 82-167, codified as General Statutes § 4-164c, which expressly exempted the claims commissioner from General Statutes § 4-183, the UAPA provision that permits appeals to the Superior Court. The claims commissioner unsuccessfully moved to dismiss the appeal for lack of subject matter jurisdiction in light of this amendment. After the Superior Court sustained the plaintiffs' appeal, the claims commissioner appealed to this court, but did not press his claim that the amendment applied retroactively and constituted a jurisdictional bar to the plaintiffs' appeal to the Superior Court. He abandoned this claim at oral argument because there was neither express language nor legislative history supporting a retroactive application. We concluded, despite this concession and in the absence of any legislative history indicating that the legislation was in response to the plaintiffs' case, or was intended to clarify the earlier statute, that the amendment "should be read as a clarification of the Superior Court's ongoing lack of jurisdiction to hear appeals from the claims commissioner." Id., 541.

Turning to the legislative history of Public Acts 1985, No. 85-112, we find numerous indications that the legislature intended that act to clarify the original intent of General Statutes (Rev. to 1985) § 52-146k so as to apply to communications occurring between a battered woman and her counselor prior to the effective date of the act. For example, during public hearings before the judiciary committee, Cheri Fidler, associate executive director of the Hartford Regional YMCA, testified: "I am here today to strongly support your consideration of House Bill 5311 which *clarifies* the intent of this law. It would prohibit the disclosing of confidential communication made at any time by a victim to a battered women's counselor or sexual assualt counselor, whether the communication was made prior to October 1st, 1983

or after." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1985 Sess., p. 285. Representative William L. Wollenberg, during discussions with Fidler concerning a trial court ruling requiring the disclosure of communications between a YMCA counselor and her client which were made prior to the effective date of the act, stated: "We realize that there was some need for this after the case was brought to our attention," and "this *clarifies* that anything before October [1983] is also privileged." (Emphasis added.) Id., pp. 285–86.[11]

We also note that the legislature first attempted to clarify General Statutes (Rev. to 1985) § 52-146k (b) in 1984 by Public Acts 1984, No. 84-402. In addition to protecting all communications, no matter when made, that proposed legislation also expanded the privilege to communications with social workers. The Governor vetoed the legislation because of this proposed expansion. Public Acts Veto Message, Public Acts 1984, No.

---

[11] In addition to Representative Wollenberg's comments to this effect quoted in the text, other testimony before the judiciary committee revealed the stimuli for the amendment to be a reaction to prior judicial decisions. For example, Sam Mclure testified as follows: "When this act began to be utilized, it came to pass judges were reluctant to protect the confidential communications which took place prior to the law's passage.

"That original intent, the intent illustrated by this legislature for the past two years is for communications between a sexual assault or battered women's counselor and the victim to be confidential." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1985 Sess., p. 304.

Jeanne Milstein, legislative coordinator of the Permanent Commission on the Status of Women, testified: "Last year this bill was introduced . . . . The intent of that bill was to *clarify* the effective date of the statute that passed two years ago regarding privileged communications between counselors and shelters for abused women . . . . That's Public Act 83-429.

"A serious problem has arisen in the implementation of that statute because the court refused to find communications made prior to the effective date of this law, October, 1984, confidential under the statute. And it has the potential of affecting many cases, and I have those statistics available. I won't take your time with that." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1985 Sess., p. 353.

84-402, Volume 111, p. 1039. The legislative history of Public Acts 1984, No. 84-402, of which the 1985 public act can be considered a progeny, reveals that the purpose of the bill was to clarify the legislative intent of General Statutes (Rev. to 1985) § 52-146k. During debate in the House of Representatives, Representative Lawrence M. Riefberg explained: "Last year this General Assembly passed Public Act 83-429, AN ACT CONCERNING CONFIDENTIAL COMMUNICATION BETWEEN A VICTIM SERVICE COUNSELOR AND A VICTIM, intending at that time to protect confidential communications between victims of sexual assault or battery and the counseling services they sought as a result of that battery.

"The law does protect that. However, it has been interpreted, at least in one court decision which was later dismissed, that the communications before October 1, 1983, would not be included. This amendment *clarifies* that as long as the request came after October 1, 1983, the communications would be confidential and therefore not discloseable." (Emphasis added.) 27 H.R. Proc., Pt. 13, 1984 Sess., p. 4779.

We conclude, based on our review of the legislative history, that Public Acts 1985, No. 85-112, was intended to clarify the original intent of General Statutes (Rev. to 1985) § 52-146k (b), namely, that all communications, no matter when made, which are sought to be disclosed after October 1, 1983, are privileged. The 1985 amendment appears to be a classic reaction to a judicial interpretation that was deemed inappropriate. See footnote 11, supra. Our statements in *State* v. *Blasko,* supra, are particularly appropriate in this case. "Once litigation brought that ambiguity to light, the legislature acted to remove any doubt about its earlier intentions. Its action in [1985] therefore invokes the principle of statutory construction that '[i]f the amendment was enacted soon after controversies arose as to the interpretation

of the original act, it is logical to regard the amendment as a legislative interpretation of the original act. . . .' 1A J. Sutherland, supra, § 22.31. Even though the legislative clarification was prompted by a judicial decision that the legislature deemed mistaken, such a clarification does not constitute an invasion of judicial authority. Like legislatures, judges are fallible. The legislature has the power to make evident to us that it never intended to provide a litigant with the rights that we previously had interpreted a statute to confer. *Circle Lanes of Fairfield, Inc.* v. *Fay,* supra, 540–41; *Neyland* v. *Board of Education,* supra, 180–85; *Lee* v. *Board of Education,* supra,75; *Tax Commissioner* v. *Estate of Bissell,* supra, 245." *State* v. *Blasko,* supra, 558. Similarly, the legislature has the power to make evident to us that it did intend to provide a litigant with rights which we previously had interpreted a statute not to confer.

In light of our conclusion that Public Acts 1985, No. 85-112, was intended to clarify, rather than change, existing law, we do not reach the second question posed in *Circle Lanes of Fairfield, Inc.* v. *Fay,* supra, 540, of whether the change was to have retroactive effect. Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect. See id., 540–41. We note, however, that the retroactive nature of clarifying legislation has limits. It "must not operate in a manner that would unjustly abrogate vested rights." *Hartford* v. *Freedom of Information Commission,* 201 Conn. 421, 426, 518 A.2d 49 (1986). In this case, we perceive no abrogation of vested rights by Public Acts 1985, No. 85-112. Therefore, in this case the defendant's communications with her counselor made *before* the effective date of the act were erroneously admitted at her trial, held *after* that effective date.

Our inquiry does not end with this conclusion that the admission of the evidence was erroneous. "We now consider whether the admission of the testimony was so prejudicial to the rights of the defendant as to deprive [her] of a fair trial. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). Stated another way, the question is 'whether the claimed erroneous action of the court would have been likely to affect the result.' *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976)." *State* v. *Talton,* 197 Conn. 280, 289, 497 A.2d 35 (1985). We conclude that it is not likely that the erroneous admission of the evidence affected the result in this case.

First, we note that to a large extent the erroneously admitted evidence was cumulative of testimony of other witnesses indicating that the relationship between the defendant and her husband was problematical. Neighbors and friends testified that the couple often had argued, and that the frequency of the arguments had increased immediately prior to the incident. A neighbor testified that he occasionally feared for the defendant's well-being when he heard them arguing, especially since the victim had characterized himself as hot-tempered. This neighbor was aware that on at least one occasion the victim had hit the defendant. Another witness testified that the defendant had confided that her husband had choked her. The victim's brother testified about the incident of violence which precipitated the defendant's contact with the shelter.

Furthermore, the improperly admitted evidence was cumulative of other motive testimony. There can be no doubt that Archer's testimony that the defendant was the victim of long term physical and mental abuse was probative of her motive to commit the crime. There was, however, other substantial evidence in this regard, including the defendant's extensive knowledge of the terms of her husband's insurance policies of which she

was the intended beneficiary, and her sexual affairs with other men both prior to and immediately after her husband's death.

Finally, after viewing the evidence in the case in its entirety, we conclude that if the testimony of Archer had been properly excluded, it is unlikely that the result would have been different. The jury could reasonably have found the following: The defendant bought a crossbow one week before the assault, ostensibly as a gift for her husband on his birthday. The victim's birthday, however, was not until the following month. According to friends and relatives, the victim had never expressed an interest in crossbows. In fact, it was the defendant who had an interest in archery and crossbows. The defendant claimed to have given her husband the crossbow the day she bought it. The victim, however, never mentioned the gift to anyone, not even to his brother who accompanied him, on the day he was assaulted, to the sporting goods section of a department store, where they observed and commented on a bow and arrow set. Prior to purchasing the crossbow, the defendant had attempted to buy a gun from two friends, again ostensibly as a gift for her husband. Further, there was extensive testimony with respect to the defendant's lack of emotion at her husband's death, and with respect to the dramatic positive change in her personality and appearance immediately following his death. Finally, the defendant's theory, namely, that either an intruder had come in with a crossbow or had come across it in the hall closet where it was kept and then shot the defendant while he was sleeping, was strongly countered by the state's evidence. That evidence included testimony that trained police dogs, on two occasions, followed the scent on the crossbow, which was found thrown on the ground outside the house, back into the house. It was the conclusion of the officer conducting the search that the same person who

left the crossbow outside the house thereafter went back inside the house. This evidence pointed only to the defendant.

While it is true that most of the evidence implicating the defendant was circumstantial in nature, the law makes no distinction between the probative force of direct evidence and circumstantial evidence. *State* v. *Rodgers,* 198 Conn. 53, 58, 502 A.2d 360 (1985). Under the facts of this case, we conclude that the erroneous admission of the evidence was harmless.

There is no error.

In this opinion the other justices concurred.