[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT MAGUIRE GROUP'SMOTION FOR SUMMARY JUDGMENT
FACTUAL BACKGROUND
On September 3, 1992, the plaintiffs, Albert L. Sandella, Jr. and Cheryl Sandella, filed a four count amended complaint against the defendants, Dick Corporation (Dick Corp), MaGuire Group, Inc. (MaGuire) and Metcalf Eddy Services, Inc. (Metcalf). Count one alleges negligence against Dick Corp. Count two alleges negligence against MaGuire. Count three alleges negligence against Metcalf. Count four alleges a loss of consortium claim against all three defendants. On August 15, 1994, MaGuire filed a motion for summary judgment on counts two and four of the amended complaint. This motion was accompanied by a supporting memorandum of law and an affidavit of James B. Fritz, Senior Vice President of MaGuire. On September 9, 1994, the plaintiffs filed a memorandum in opposition to MaGuire's motion for summary judgment. On March 17, 1995, MaGuire filed a reply to the plaintiffs' opposition to MaGuire's motion for summary judgment. On March 23, 1995, the plaintiffs filed supplemental information to their opposition to MaGuire's motion for summary judgment.
The amended complaint alleges the following facts. Albert Sandella was employed by the Town of North Haven, Connecticut, as an Operations and Maintenance Foreman in its water pollution control facility located at Universal Drive, North Haven, Connecticut. At all relevant times, Dick Corp. was engaged in the construction of the new water control facility for the Town of North Haven; MaGuire was engaged in the design of the new water control facility for the Town of North Haven; and Metcalf was engaged in the running of the new water control facility for the Town of North Haven.
On July 19, 1990, the defendants stored catatonic polymers, a CT Page 6629 chemical substance used in the operation of the filter press in the water pollution control facility, in 55-gallon drums in the building under construction by Dick Corp. This chemical substance was leaking from the drums in which it was stored as well as being spilled by workers who were using the chemical substance throughout the building. On or about the same day, a hose was run into the building from underneath the stairwell on the ground floor through a doorway on the second floor in order to spray water into the gravity thickener tank of the water pollution control facility. The catatonic polymer combined with the water leaking from the hose forming a slippery substance on the ground floor of the building.
At various times prior to July 19, 1990, Albert Sandella, while working, noticed the existence of the chemical substance on the floor of the building and requested that Roy Collins, an agent, servant, and/or employee of Metcalf Eddy, have Dick Corp. clean up said substance. On or about July 19, 1990, Albert Sandella, during the course of his employment, was caused to slip and fall on the combination of the chemical substance and water thereby incurring injury.
Count two of the plaintiffs' revised complaint alleges that MaGuire was engaged in the design of the new water pollution control facility for the Town of North Haven and in overseeing its construction. The plaintiffs further allege that the building and premises were controlled, possessed, managed and/or maintained by MaGuire.
LEGAL DISCUSSION
The defendant argues that counts two and four of the plaintiffs' complaint are barred, as a matter of law, by the Workers' Compensation Act, Connecticut General Statutes § 31-293(c).
The plaintiffs argue that (1) § 31-293(c) is inapplicable in the present case because MaGuire acted in such a capacity as to place itself outside of the scope of § 31-293(c) and (2) if found applicable, § 31-293(c) is unconstitutional because it creates a specific immunity for MaGuire without having any bearing on the facts of this case.
General Statutes § 31-293(c) states, in pertinent part:
 [N]o construction design professional who is retained to perform professional services on a CT Page 6630 construction project, or any employee of a construction design professional who is assisting or representing the construction professional in the performance of professional services on the site of the construction project, shall be liable for any injury on the construction project for which compensation is payable under the provisions of this chapter, unless responsibility for safety practices is specifically assumed by contract.
 For the purposes of this subsection "construction design professional" means (1) any person licensed as an architect under the provisions of chapter 390, (2) any person licensed, or exempted from licensure, as an engineer under the provisions of chapter 391, or (3) any corporation organized to render professional services through the practice of either or both of such professions of this state.
General Statutes § 20-288, found at chapter 390, provides, in pertinent part:
 (2) "`Architect' means a person who engages in the practice of architecture."
 (3) The "practice of architecture" means rendering or offering to render of service by consultation, investigation, evaluations, preliminary studies, plans, specifications and coordination of structural factors concerning the aesthetic or structural design and contract administration of building construction or any other service in connection with the designing or contract administration of building construction located within the boundaries of this state, regardless of whether such persons are performing one or all of these duties or whether they are performing them in person or as the directing head of an office or organization performing them. CT Page 6631
General Statutes § 20-299(1), found at chapter 391, provides, in pertinent part:
 "Professional engineer" means a person who is qualified by reason of his knowledge of mathematics, the physical sciences and the principles of engineering, acquired by professional education and practical experience, to engage in engineering practice, including the rendering or offering to render to clients any professional service such as consultation, investigation, evaluation, planning, design or responsible supervision of construction, in connection with any public or privately-owned structures, buildings, machines, equipment, processes, works or projects wherein the public welfare or the safeguarding of life, public health or property is concerned or involved.
The plaintiffs argue that MaGuire acted outside its capacity as a construction design professional by (1) assisting the owner Town of North Haven in soliciting and selecting the contractor to construct the water treatment facility and (2) hiring defendant Metcalf to be present on the construction site to oversee the work performed by the defendant contractor and the employees of the Town of North Haven. However, these two services fall within the practice and services of architects and engineers as defined by § 20-288 and § 20-299 respectively. Therefore, these services would fall within the ambit of "professional services" for the purposes of § 31-293(c) immunity. Accordingly, § 31-293(c) is applicable to the present case.
The plaintiffs next argue that General Statutes § 31-293(c) is unconstitutional in that it violates Article I of the Connecticut constitution[1] and the Fourteenth Amendment of the United States constitution[2].
"When a statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. When a statutory classification impinges upon an inherently suspect class or affects a fundamental personal right, the statute is subject strict scrutiny and is justified only by a compelling state CT Page 6632 interest. Otherwise, a statute will stand only if it bears a reasonable relation to a legitimate state interest" (Citations omitted; internal quotation marks omitted.) Zapata v. Burns,207 Conn. 496, 505, 524 A.2d 700 (1988).
"The key to discovering whether a right is fundamental is in assessing whether the right is explicitly or implicitly guaranteed by the Constitution. . . . Such rights include first amendment rights, which are explicitly provided for by the Constitution . . . the right to travel interstate, which has been found to be implicit in the Constitution . . . and the right to vote. . . . Further examples of fundamental rights implicitly guaranteed by the constitution are those of marriage . . . privacy . . . and freedom of association." (Citations omitted; internal quotation marks omitted.) Id., 506.
In Zapata, the court stated "we have never held . . . that a constitutional right of access to the courts automatically translates each and every claim that a litigant may raise into one invoking fundamental rights. It cannot seriously be argued that a statutory entitlement to sue . . . is itself a `fundamental' or `constitutional' right." (Citations omitted; internal quotation marks omitted.) Id., 507. It follows then,, that if a statutory entitlement to sue is not deemed a fundamental or constitutional right, then the right to bring a common law negligence action is neither a fundamental nor constitutional right. Consequently, the plaintiff has not proffered a violation of a fundamental right in the present action. Therefore, the standard by which to determine the plaintiff's equal rights protection challenge of General Statutes § 31-293(c) is the rational basis test.
In conducting a rational basis analysis, the court must decide "first whether there are natural and substantial differences between the classes preferred by the legislation and all others, and then whether the differences identified are logically related to the subject and object of the legislation." Zapata v. Burns,
supra, 509-10. "A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Id., 507. "The court's function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way." Fair Cadillac-Oldsmobile IsuzuPartnership v. Bailey, 229 Conn. 312, 317-18, 640 A.2d 101 (1994). "If an enactment meets this test, it satisfies the constitutional CT Page 6633 requirements of due process." Id. 319.
"In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." Calfee v. Usman,224 Conn. 29, 33, 616 A.2d 250 (1992). "Every presumption is to be given in favor of the constitutionality of the statute." FairCadillac-Oldsmobile Isuzu Partnership v. Bailey, supra,229 Conn. 316. "[C]ourts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) Zapata v. Burns, supra, 507-08. "[A] party challenging the constitutionality of a statute must prove its constitutionality beyond a reasonable doubt." (Internal quotation marks omitted.) Fair Cadillac-Oldsmobile Isuzu Partnership v.Bailey, supra, 229 Conn. 316.
The plaintiffs argue that § 31-293(c) is unconstitutional because the specific immunity granted to design professional lacks a rational relation to the facts of this case. Of course, the defendant argues that § 31-293(c) is constitutional.
The court, in Zapata, noted a number of "very strong factors distinguishing" design professionals and others involved in the construction process. Zapata v. Burns, supra, 513. "The legislature might have concluded that the different education, training, experience, licensing and professional stature of architects and engineers made it more likely that a limitation on their tort liability would not reduce the care with which they performed their tasks than would be the case with contractors. The legislature may also have thought it necessary to reduce the potential liability of architects and engineers in order to encourage experimentation with new designs and materials." Id. The Zapata court further concluded that "the classification of architect and engineers in a manner different from other groups involved in the construction process bears a rational relationship to a legitimate state end and is based on reasons related to the accomplishment of that goal." Id., 513-14.
In determining the legislative intent of a statute, the court has "repeatedly approved references to testimony before legislative committees in order to shed light on legislative intent." State v.Magnano, 204 Conn. 259, 274, n. 8, 528 A.2d 760 (1987). A review of the legislative hearings regarding the enactment of § 31-293(c) reveals a recognition of the intrinsic differences between the role of a design professional and the roles of others involved in the CT Page 6634 construction process. See Conn. Joint Standing Committee Hearings, Judiciary, 1986 Sess., pp. 16-59. Testimony given at the hearings provides that:
 [t]he architects and engineers are responsible for the designing of the project. They are responsible to make sure that the bridge does not fall down through an error in design, or that a building does not collapse or that something within a building doesn't collapse. That is their responsibility and, as such, they are rightfully liable should that design be defective. The contractor, on the other hand, is responsible for the actual construction of the project and again, all of the safety mechanisms that go into place during the construction period. He deals with construction every day. He knows all the laws that deal with construction and OSHA and the safety factors.
Id., 53.
Further testimony provides that:
 [t]he ultimate boss on the job in terms of construction is the general contractor. . . . It is only the architect or the engineer's responsibility to be sure that the design is being built, that it is being built in accordance with the specifications of the design. That is why an engineer or an architect may go out to make sure that he specifies certain materials, for example, that they haven't been substituted without anybodys [sic] knowledge because they might cause a collapse."
Id., 53-54.
The legislative history further provides that the usual architect and contractor contracts contain provisions that place the entire responsibility for safety on the contractor. See id., 52. In the instant action, the owner's contract with the design professional for professional services details the extent of CT Page 6635 Maguire's [MaGuire's] duties and responsibilities with regard to the construction of the project. (See Exhibit B: Agreement between Owner and Engineer for Professional Services, Article 1.6.3, November 6, 1993, attached to MaGuire's memorandum of law in support of summary judgment.) The contract provides, in pertinent part:
 [the design professional shall] make periodic visits to the site of the construction to generally observe the progress and quality of the construction work and to determine, in general, if the results of the construction work are in accordance with the drawings and specifications. On the basis of his on-site observations as an engineer, he shall endeavor to guard the owner against apparent defects and deficiencies in the permanent work constructed by the contractor, but does not guarantee the performance of the contractor. The engineer shall not be required to make exhaustive and continuous on-site observations to check the quality or quantity of the construction work. The engineer is not responsible for the means, methods, techniques, sequences or procedures, time of performance, programs, or for any safety precautions in connection with the construction work.
Moreover, the contract to construct the, project between the owner, the Town of North Haven, and the contractor, Dick Corp., expressly provides that the contractor is fully responsible for the safety of the project. (See Exhibit C: Agreement between Owner and Contractor, September 30, 1993, attached to MaGuire's memorandum of law in support of summary judgment.) Article 1, section A, of the Supplemental General Conditions states, in relevant part:
 The Contractor will be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work. He will take all necessary precautions for the safety of and will provide the necessary protection to prevent damage, injury or loss to: CT Page 6636
 1. All employees on the work and other persons who may be affected thereby; . . .
Additionally, Article 54, section B, of the General Conditions states, in relevant part:
 All injury or damage of whatever nature resulting from . . . the work during its progress from whatever cause shall be the responsibility of and shall be borne and sustained by the Contractor.
Thus, in the instant action, the responsibility for safety of the work site was expressly assumed by the contractor, Dick Corp. This contract relationship evidences the differences between the design professional and the contractor with regard to control of the construction and of the safety measures involved in such construction. These differences form a rational basis for creating a specific immunity for design professionals, as was created by General Statutes § 31-293(c) which is, therefore, constitutional.
Accordingly, the defendant MaGuire's motion for summary judgment on counts two and four of the plaintiff's amended complaint must be granted.
CONCLUSION
Based on the foregoing, the defendant Maguire [MaGuire] Group's Motion for Summary Judgment (#143) is granted.
So ordered.
Michael Hartmere Judge of the Superior Court