527 So.2d 725 (1986)
Margie Lee USREY
v.
STATE.
7 Div. 291.
Court of Criminal Appeals of Alabama.
May 27, 1986.
Rehearing Denied August 12, 1986.
*726 Betty C. Love, Talladega, for appellant.
Charles A. Graddick, Atty. Gen., and Jean Alexandra Webb, Asst. Atty. Gen., for appellee.
LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty of the murder of her husband, Jerry Merrell Usrey, as charged in an indictment returned by the Grand Jury on October 21, 1983. According to the statement of the facts contained in brief of counsel for appellant, which is conceded to be "substantially correct" in brief of counsel for appellee, the following occurred:
"On May 12, 1983, at approximately 8:04 P.M., in Sylacauga, Alabama, the defendant, Margie Lee Usrey, called a neighbor, Jeannie Davis and stated to her that she had shot her husband, Jerry Usrey. Miss Davis summoned her roommate, Mary Hosey, and the two went to the Usrey residence, which was located some seventy-five feet away. When they arrived they discovered the body of Jerry Usrey in a bedroom of the Usrey trailer, whereupon Jeannie Davis called the Sylacauga Police.
"Officer Marty Batson of the Sylacauga Police Department was dispatched to the scene in response to Miss Davis' call. One of the women other than the defendant met Officer Batson at the door of the residence and advised him that there had been a shooting inside and that, in her opinion, the subject was deceased. After being advised of this, Officer Batson entered the premises without obtaining either a warrant or the consent of Mrs. Usrey. Upon entering the trailer, Officer Batson secured the scene. Officer Batson testified that after securing the scene he was no longer under any fear or apprehension that some unidentified person might be loose in the trailer. Upon securing the scene, Officer Batson called *727 his station, reported the homicide, and requested the detective division, a photographer, and the chief. During the next four hours Officer Batson and others participated in a warrantless search which involved opening closets and chests of drawers, and looking under clothing and beds. During the search evidence was seized and photographs were taken of the interior of the trailer and its contents. The body of the deceased was transported to Cooper Green Hospital in Birmingham, Alabama, where Dr. Joseph Embry performed an autopsy upon the body on May 13, 1983. During the course of the autopsy Dr. Embry recovered six projectiles from the body of the deceased. The only warrant obtained by police in this case was issued on May 16, 1983, three days after the autopsy and four days after the initial search of defendant's residence.
"At trial the photographs taken in the search of defendant's residence and the projectiles removed from the body of the deceased were received into evidence over defendant's motion to suppress and over contemporaneous objection raising the issue of the constitutionality of the searches and seizures. Defendant was convicted of murder on March 27, 1984."
Two issues are presented in brief of counsel for appellant, which we now proceed to consider.

I.
By appellant's first issue, the contention is made in brief of her counsel that the trial court committed error "in admitting evidence seized during an autopsy of the body of defendant's deceased spouse" consisting of six bullets removed during an autopsy performed upon the body of the deceased by Dr. Joseph Embry "over objections challenging the seizure of items on constitutional grounds," which projectiles were identified as having been fired from the weapon seized at defendant's residence.
In support of the first issue of appellant, her counsel argues that "The law of Alabama vests in a surviving spouse a possessory interest in the remains of a deceased spouse" and cites Rehling v. Carr, 295 Ala. 366, 330 So.2d 423 (1976), and Southern Life & Health Insurance Co. v. Morgan, 21 Ala.App. 5, 105 So. 161 (1925). Response is made in brief of counsel for appellee to the position taken by counsel for appellant that appellant's Constitutional argument is totally irrelevant as the autopsy of Jerry Merrell Usrey was authorized under § 15-4-2, Code of Alabama, 1975, which states:
"(a) When a coroner has been informed that a person is dead in the county and that such person died without being attended or examined by a legally qualified physician, the coroner shall forthwith proceed to the place where the dead person is lying, examine the dead body to ascertain the cause of death, and report same in the same manner as inquests are reported.
"(b) When a coroner is unable to determine the cause of death, he may summon any physician or surgeon, who shall make an external post mortem examination of the dead body and report his opinion of the cause of death to the coroner in writing.
"(c) If the surgeon or physician is unable to determine the cause of death from an external post mortem examination and the coroner has reasonable cause to believe the deceased came to his death by unlawful means, the coroner may in such cases order any physician or surgeon to perform an autopsy or internal examination on the dead body, and report the findings of such autopsy to the coroner in writing."
Counsel for appellee further states:
"Section 15-4-2, in combination with the Tenth Amendment of the Constitution of the United States, authorized the autopsy performed on Jerry Merrell Usrey. Therefore, the trial court was correct in allowing the six (6) bullets removed from the victim's body into evidence."
We agree with the position taken by counsel for appellee and conclude that the first issue presented by appellant is not well taken.

*728 II.
The only other issue presented by appellant is captioned in brief of counsel for appellant as follows:
"THE TRIAL COURT ERRED IN ADMITTING PHOTOGRAPHS TAKEN DURING A WARRANTLESS SEARCH OF DEFENDANT'S RESIDENCE CONDUCTED AFTER THE PREMISES HAD BEEN SECURED AND ALL OCCUPANTS ACCOUNTED FOR."
Counsel for the respective parties on appeal are in disagreement as to whether the warrantless search of defendant's residence coupled with the taking of photographs of various places and articles in the residence "exceeded the scope of the exigencies that would have justified a warrantless search." Counsel for appellant argues, "Clearly the warrantless photography which occurred on the premises after the scene had been secured and all persons accounted for was outside the scope of the exigent circumstances which justified the initial intrusion" and that "as such the photographs taken during the four-hour warrantless search of the premises were due to be suppressed as being evidence seized in contravention of the defendant's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States. Thus the trial court committed error in allowing the photographs into evidence." Counsel for appellee responds by stating:
"Furthermore, the seizure of the evidence of this case was justified because the police officers were confronted with an exigent circumstance wherein the evidence might have been surreptitiously removed. The seizure and photographs were necessary to preserve the evidence. Roaden v. Kentucky, 413 U.S. 496 [93 S.Ct. 2796, 37 L.Ed.2d 757] (1973); Billingsley v. State, 402 So.2d 1052 (Ala. Crim.App.1980), reversed on other grounds, 402 So.2d 1060 (1982); Love v. State, 377 So.2d 8 (Ala.Crim.App.1979). Wherefore, the trial court was correct in allowing the photographs into evidence."
We agree with the position as taken by counsel for appellee and decide appellant's second issue adversely to appellant.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur, with BOWEN, P.J., concurring in result only.

ON APPLICATION FOR REHEARING
LEIGH M. CLARK, Retired Circuit Judge.
Contemporaneously with the filing of the application for rehearing and the brief of appellant's counsel in support of said application, said counsel has also filed what purports to be a motion pursuant to Rule 39(k), A.R.A.P., and "move this Court to add the following statement of facts to its opinion on rehearing," with which we comply to the following extent:
"The only testimony concerning an examination by the coroner of the body of the deceased was the following:
"Q. And did you examine the body of the deceased at that time?
"A. I did.
"Q. Was the body in the same condition then as it was when you first observed it at the trailer in the presence of Sergeant Marty Batson on May 12, 1983?
"A. It was.
"Q. And did you see the body and turn the body that was identified to you as being Jerry Usrey over to Linda Tampling who works with you?
"A. I did.
"Q. And when the body was turned over to Linda Tampling, was it in the same condition as it was when you *729 first saw it at the trailer on May 12, 1983?
"A. It was. [RT 378]
"On cross-examination the following testimony was elicited:
"Q. All you actually did then is go out to the scene, check the body, pronounce the man dead, and you left?
"A. Yes, ma'am. [RT 382]"
The remaining five paragraphs of said "Motion to Add Statement of Facts" consist largely of contentions or argument by appellant's counsel instead of an additional or corrected statement of facts, as to which we respectfully decline to comply, although we consider such argument in connection with our determination of appellant's application for rehearing, as shown by the following opinion.
Appellant's attorney presents two issues in support of the application for rehearing which we state and discuss.

I.
The first issue presented in brief of counsel for appellant is as follows:
"WHETHER THIS COURT ERRED IN HOLDING THAT THE STATE WAS AUTHORIZED TO PERFORM AN AUTOPSY UPON THE BODY OF DEFENDANT'S DECEASED SPOUSE IN THE ABSENCE OF EVIDENCE THAT AN EXTERNAL POST-MORTEM EXAMINATION HAD BEEN PERFORMED AND IN THE ABSENCE OF EVIDENCE THAT THE CAUSE OF DEATH COULD NOT BE DETERMINED FROM THE EXTERNAL POST-MORTEM EXAMINATION."
In support of this issue, counsel for appellant in the brief on application for rehearing argues:
"There is no testimony in the record that the coroner performed an external post-mortem examination upon the body of the deceased or that he was unable to determine the cause of death. There is no testimony in the record that the coroner summoned a physician or surgeon and that the physician or surgeon was unable to determine the cause of death through an external post-mortem examination. Thus, the provisions of Code of Alabama (1975), § 15-4-2, cannot provide a warrantless intrusion into the body of the deceased. To the contrary, in view of the testimony elicited at trial, the cited code section will clearly prohibit an internal examination of the body of the deceased."
We have no doubt that an external post-mortem examination would have been sufficient to show that Mr. Usrey had been killed by one or more bullets fired from a rifle, but we are also convinced that an internal post-mortem examination was necessary in order to determine whether the bullets that had been fired from the rifle into the prone body of the deceased came from the rifle that had been recently fired or from the empty shells that were observed by Officer Batson or the law enforcement authorities after they had come to the scene of Mr. Usrey's death.
In the last paragraph of the argument of counsel for appellant as to the issue, it is stated, "In this case the burden was on the State to establish that intrusion and seizure were lawful. Teat v. State, 409 So.2d 940 (Ala.Crim.App.1981). Failing to do so, the State was precluded under the provisions of the cited code section [Code of Alabama (1975), § 15-4-2] from performing an autopsy."
We adhere to what was held in Teat v. State and believe that we are consistent therewith in now holding that this particular issue presented in brief of counsel for appellant in support of the application for rehearing is not well taken.

II.
The only other issue presented in brief of counsel for appellant is as follows:
"WHETHER THIS COURT ERRED IN HOLDING THAT POLICE OFFICERS WHO SECURED THE CRIME SCENE AND WHO SUBSEQUENTLY LOCKED AND SEALED THE SCENE WERE CONFRONTED WITH EXIGENT CIRCUMSTANCES JUSTIFYING A WARRANTLESS SEARCH IN THAT EVIDENCE WAS NOT CAPABLE OF BEING *730 SURREPTITIOUSLY REMOVED AND THAT THE SEIZURES WERE NOT NECESSARY TO PRESERVE THE EVIDENCE."
In support of this issue, counsel for appellant argues in the brief on application for rehearing as follows:
"In holding that photographs taken during a four hour warrantless search of defendant's residence were admissible under an exigent circumstances exception to the requirements of a search warrant because items photographed could have been surreptitiously removed this Court completely overlooks the fact that, at the time the photographs were taken, the police had taken control of the premises and had established a `crime scene'. According to the first officer on the scene, he posted an officer at the entrance of the residence to prohibit entry by anyone without his prior approval. (RT 291). Upon leaving the scene the back door was `wired' shut and the front door was locked and sealed. (RT 440, 441). Clearly the police had control of the scene and surreptitious removal of evidence was capable of being prevented. Thus, the `exigent circumstance' relied upon by the State to justify this warrantless intrusion is not supported by the record. Therefore, this court's opinion in this regard is in error and is due to be reconsidered and amended."
There would probably be some merit to this contention of counsel for appellant if the search complained of had occurred during the daylight, instead of soon after 8:04 P.M. on the night of May 12, 1983, at which time it would have almost certainly been very difficult for the officers to obtain a warrant to search the premises in time to execute the warrant and at the same time maintain security of the premises and thereby avoid unjustified entrance thereto and exit therefrom. We continue to hold as we did on original submission of this cause and decline to accept the issue and argument of counsel for appellant as a proper basis for granting the application for rehearing.
It is to be noted that the writer of this opinion believes that he, as the writer of the opinion on original submission, should have, in fairness to all concerned, particularly the appellant, have discussed, by way of summary at least, the evidence pertaining to the pertinent facts, particularly those favorable to defendant-appellant. The failure to do so is attributable to some extent to the brevity of the statements of facts in briefs of counsel for appellant and counsel for appellee, which is understandable, as they were limited by the evidence relative to the two particular issues presented on appeal. In fairness to defendant-appellant, we think we should now state that the court reporter's transcript contained more than five hundred pages of testimony of witnesses for the parties, including about the same number of witnesses for the State as for the defendant, and that no witness for the State was an actual eyewitness to the death of Mr. Usrey, that the only eyewitness to his being shot and killed was the defendant herself, whose testimony is contained in approximately 125 pages of the transcript. Most of the other testimony for defendant consisted of that of character witnesses who testified that she was a person of good reputation.
The substance of most of the testimony of the defendant on the trial of the case was to the effect that for a long time prior to the night of her husband's death her husband had mistreated her physically on many occasions, that her husband had often been unfaithful to her by cohabiting with another woman, whose husband had had quarrels with defendant's husband. She testified in detail as to her husband's physical mishandling of her, by threatening to kill her with a knife or otherwise. Part of her testimony in this respect was as follows:
"Q. And where did he customarily keep that knife?
"A. Sometimes he kept it in his car. Sometimes it would be in his dresser drawer, I mean, his chest of drawers with his clothing, which most of the time is where he left it.
"Q. In his bedroom?
"A. Yes, ma'am.

*731 "Q. Had he ever threatened you with that knife?
"A. Yes, ma'am.
"Q. On how many occasions?
"A. Several occasions, but one in particular the night that I was onon Saturday night that he had put it to my throat. And then one timeone Sunday, oh, about four or five months before this, Jerry [her husband] and I were down visiting his sister, Helen, and he was mouthing off down there, like Jerry was good at.
"Q. Was he drinking?
"A. Yes, he was drinking.
"....
"A. And, then, when we came on, we got up to Fayetteville, he just pulled off to the side of the road and he hit me and knocked my glasses off. And then he pulled this knife out and kind of jabbed it like that (indicating) towards my side. And he told me that he would just cut my guts out.
"Q. What type automobile were you in?
"A. We was in a Monte Carlo.
"....
"Q. Did you have a weapon at that time?
"A. No, ma'am.
"Q. Did you strike him at any time during this difficulty?
"A. No, ma'am."
Toward the end of the final cross-examination of the defendant, she testified:
"Q. But your problems in this case, just like you testified to on direct examination when you said, `Our problems were[the first name and the last name of the female with whom the defendant testified her husband had been having an affair], that was the problem, wasn't it?
"A. That was a problem.
"Q. And you just weren't going to give him a divorce, were you?
"A. If Jerry had wanted a divorce he could have got one. He would have went to a lawyer and filed for one. I loved Jerry deeply.
"Q. I'm not asking youyou loved him deeply and shot him ten times?
"A. Yes, I loved him, but I didn't
"Q. I believe you said that the only thing you knew about the gun, on direct examination, was, `all I knew was to pull the trigger'.
"A. That's right.
"Q. And you pulled it ten times, didn't you?
"A. I don't remember pulling it that many times. I said when I walked in the door I don't even remember pulling the trigger.
"Q. You don't remember pulling it at all?
"A. Right.
"Q. But you knew that it takes three things from that gun to hurt somebody, wouldn't it? First of all, you have got to point it at them. Next of all, you have got to take that safety off. And next of all, you have got to squeeze that trigger. And you are telling the ladies and gentlemen of the jury that you don't know how to shoot that gun, and you hit him with every shot that was fired?
"A. I did not know how to shoot the gun, Mr. Rumsey.
"Q. He had eight to ten wounds in his body.
"A. I didn't know how to shoot the gun.
"Q. But you know when you level it off on somebody like that what it does when you squeeze that trigger, don't you?
"A. Yes, I'm sure it would kill somebody.
"Q. And you pulled it out from under the bed, didn't you?
"A. I pulled the gun from under the bed.
"Q. And you never told your son, Bobby, whose gun it is, to get it out of the house, had you?
"A. Get it out of the house?
"Q. Yes.
"A. He's taken the gun out.
"Q. `Take it away. Jerry has been threatening me with it.' You never told Bobby that, have you?
"A. They had taken the gun and
"Q. I'm asking you a specific question.
"A. No, sir.

*732 "Q. And, as a matter of fact, your testimony on direct examination, he asked you when he got home, he said what were you doing there. You had some conversations with him about that if you left the trailer for a day or two that he would get his stuff and he would be gone over the weekend didn't he? And that's the reason he asked you what you were doing there?
"A. No, sir.
"Q. Every time that you have testified to Mrs. Love's questions about what he would do to you, he was drinking just about, wasn't he?
"A. On some occasions.
"Q. But he wasn't drinking a drop that night, and you know it, didn't you?
"A. He was not drinking that night, but
"Q. As a matter of fact, Jerry worked overtime a lot, didn't he? He would come in late a lot of times, wouldn't he?
"A. He did work late some.
"Q. He had been working late that night when he came in, hadn't he?
"A. I don't know.
"Q. Well, did you know[the other woman] was working the concession stand down at the Little League ball game?
"A. Pardon?
"Q. That[the other woman] was working the concession stand down at the Little League ball game that night?
"A. No, sir."
We think that we have now set forth, either in the opinion on original submission or in this opinion, sufficient facts to show that we have not been presented with any issue, or argument in support thereof, that would justify a reversal of the trial court. We believe also that by this opinion on application for rehearing we have done as we should have done in showing that there was strong evidence to the effect that the conduct of defendant in causing the death of her husbnad was in self-defense. We are glad to note that the trial court in fixing her punishment imposed a sentence of only twenty years, whereas according to Alabama Criminal Code, § 13A-5-6(a)(1), the sentence for said felony is "for life or not more than 99 years or less than 10 years."
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.