ON APPLICATION FOR REHEARING
Our opinion issued October 6, 1989, is withdrawn and set aside. The following is hereby adopted as the opinion of this court. Thomas Wayne Spears was indicted for the murder of his wife, Leslie Marie Spears. After a pretrial hearing on Spears's motions to suppress, the trial judge granted a portion of one motion and ordered the suppression of certain evidence found at the scene of the crime. This appeal is taken by *Page 1146 
the State from the order of suppression of the circuit court.
Essentially, the evidence shows that a Jackson police officer, Maurice Dyess, responded to a radio dispatch regarding a shooting at the defendant's residence. Upon his arrival, he entered the residence and took the defendant outside to his patrol car. The officer re-entered the residence and determined that Mrs. Spears was dead. He then ascertained that there was no one else present in the residence and secured the house. The integrity of the crime scene was maintained until approximately three hours later, when a medical examiner/investigator for the Alabama Department of Forensic Sciences arrived and helped process the crime scene. Basically, the trial court suppressed all of the evidence seized by law enforcement officers and the forensic scientist after Officer Dyess's initial two entries into the residence. The trial court did rule that Officer Dyess could testify to what he observed in plain view.
For the purposes of this appeal, the relevant portions of the suppression order of the trial court appear as follows:
"ORDER
 "WHEREAS, heretofore, on the 15th and 16th days of August 1988, a pre-trial hearing was conducted by the Court on defendant's Motion to Suppress the Purported Confession or Statements of the Defendant and on the defendant's Motion to Suppress Illegally Obtained Evidence; and WHEREAS, evidence and testimony were presented on said Motions; and WHEREAS, the attorneys for the defendant filed a brief in support of their said Motions on the 30th day of August 1988; and WHEREAS, by letter dated the 9th day of September 1988, the District Attorney informed the Court of his decision not to file a formal response brief; and WHEREAS, Stuart C. DuBose, one of the attorneys for the defendant, filed a letter brief, together with an enclosure, the same being dated October 14, 1988; and WHEREAS, the Court has carefully read the cases of Margie Lee Usrey vs. State, 527 So.2d 725, 527 So.2d 732, 527 So.2d 741, and Bobby James King vs. State, 521 So.2d 1042, and has reviewed the cases of Lillian Thompson vs. Louisiana, 469 U.S. 17, [105 S.Ct. 409, 83 L.Ed.2d 246] and Rufus Junior Mincey vs. State of Arizona, 437 U.S. 385, [98 S.Ct. 2408, 57 L.Ed.2d 290] and the same being considered and understood by the Court;
 "It is, therefore, ORDERED, ADJUDGED, and DECREED that the Motion to Suppress the Purported Confession or Statements of the Defendant, be, and hereby is, denied. It is specifically ORDERED that the following statements are not subject to being suppressed, pursuant to the defendant's said Motion, namely: (1) the statement made by the defendant to Officer Richard David Coleman at approximately 3:15 p.m. on December 7, 1987; (2) the statement made by the defendant to Officer Maurice Dyess at approximately 3:55 p.m. on the 7th day of December 1987; (3) the statement made by the defendant to the District Attorney's Investigator, Charles O. Breland, at approximately 7:30 p.m. on December 7, 1987; and (4) the statement made by the defendant to the Chief of Police of the City of Jackson, William S. Taylor, on the 7th day of December 1987;
 "It is, further, ORDERED, ADJUDGED, and DECREED that the following numbered exhibits offered by the State of Alabama at the hearing on the 15th and 16th days of August 1988, are not subject to the defendant's said Motion to Suppress Illegally Obtained Evidence, but are determined by the Court to be admissible, namely: (1) State's Exhibits No. 7 through 37 (photographs); (2) State's Exhibit No. 39 (defendant's statement with Miranda Rights attached thereto); (3) State's Exhibit No. 40 (statement made by defendant with Miranda Rights attached thereto); (4) State's Exhibit No. 41 (Consent to Search Form); (5) State's Exhibits No. 42 through No. 65 (items obtained pursuant to the Consent to Search Form, i.e., State's Exhibit No. 41). *Page 1147 
 "It is, further, ORDERED, ADJUDGED, and DECREED that the following items of evidence obtained by law enforcement officers during the course of their investigation are subject to being suppressed, pursuant to the defendant's said Motion to Suppress Illegally Obtained Evidence, namely: (1) State's Exhibit No. 1 (a shotgun); (2) State's Exhibit No. 2 (a .22 rifle); (3) State's Exhibit No. 3 (a single-barrel shotgun); (4) State's Exhibit No. 4 (brown bag); (5) State's Exhibit No. 5 (gray bag); (6) State's Exhibit No. 6 (Outers gun cleaning kit); (7) State's Exhibit No. 38 (cushion); (8) State's Exhibit No. 66 (sketch of crime scene); (9) State's Exhibit No. 67 (small diagram); (10) State's Exhibit No. 68 (bag with wadding and pellets); (11) State's Exhibits No. 69 through No. 94 (photographs); (12) State's Exhibit No. 95 (measurements); and, (13) State's Exhibit No. 96 (shirt of deceased).
 "The Court notes and finds that when Officer Maurice Dyess arrived at the home of the defendant, Thomas Wayne Spears, on December 7, 1987, at approximately 3 p.m., that the officer had reason to believe that a person within the Spears residence was in need of immediate aid. Thus, although Officer Dyess had neither a search warrant nor the consent of the defendant to enter the residence of the defendant, the Court finds that the officer, nevertheless, had probable cause to enter the said premises. However, it became immediately apparent to Officer Dyess, upon entering the premises, that any emergency had subsided, in that Leslie Marie Spears, the alleged victim, was deceased. Further, Officer Dyess immediately escorted the defendant outside the residence, and secured, or protected, the residence ('the scene'). Further, Officer Dyess testified that it was approximately 3 p.m. in the afternoon, and that no one else was in the house, other than the deceased. Additionally, Officer Dyess testified that he did not personally seize any items of evidence, and that he did not personally mark any items of evidence which were subsequently seized on December 7, 1987, by other law enforcement officers, and that he was not even present when the items were seized. It is the Court's finding that Officer Dyess can testify as to what he observed that was in plain view during the course of his immediate legitimate emergency entrance.
 "The law enforcement officers elected not to secure a search warrant from a readily available neutral and detached magistrate, although any emergency had subsided, there was no person other than the deceased in the house, and the scene had been secured.
 "The Court finds from the testimony that there was no indication that the evidence that was subsequently seized by law enforcement officers on the 7th day of December 1987, would be lost, destroyed, or removed during the time required to obtain a search warrant. Indeed, the constant and continuous police guard minimized that possibility.
 "Most of the items of evidence, which the Court has Ordered to be suppressed as being illegally obtained, were seized by John Michael Taylor, an employee of the Alabama Department of Forensic Sciences. Taylor drove from Mobile, Alabama, and did not arrive at the scene in Jackson, Alabama, until approximately 6 p.m., some three (3) hours after the scene was 'secured.'
 "The Court's decision is premised upon the following cogent factors: (1) that none of the items ordered to be suppressed by the Court were seized by the initial investigating officer, Officer Maurice Dyess, or in his presence; (2) that the scene was secured subsequent to 3 p.m. and that a search warrant could have been obtained from a neutral and detached magistrate; and, (3) that approximately three (3) to four (4) hours lapsed between the initial entry by Officer Dyess and the seizure of the suppressed items of evidence by John Michael Taylor, who drove from Mobile to the scene."
 I
We find that the circuit court applied an incorrect, although understandable, interpretation *Page 1148 
of Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408,57 L.Ed.2d 290 (1978), to the particular facts of this case. Although there is authority to support the decision of the circuit court, see State v. Hockenhull, 525 A.2d 926, 931-32 (R.I. 1987), that is not the interpretation that has apparently been adopted by the courts of this State.
"[W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. . . . But a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.' " Mincey v.Arizona, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 2413,57 L.Ed.2d 290 (1978) (quoted in Ex parte Usrey, 527 So.2d 732, 736 (Ala. 1987)).
 " '[T]he courts rather readily recognize that the police may make a warrantless entry into premises where they reasonably believe a dead body will be found. When an entry has been made for that purpose or for the purpose of rendering aid to a person believed to be in need of medical assistance and a body is found, it has not been assumed that Mincey requires that the police do nothing more until a warrant has been obtained. An "examination of the body" is permissible, and the police need not close their eyes to objects of evidentiary value which are in the immediate vicinity of the body. In addition, it is quite proper for "an officer at a homicide scene to make a prompt warrantless search of the area for other victims or the presence of the killer," . . . and evidence found during such an exploration is also subject to seizure. Moreover, "securing the residence by making certain all doors and windows [are] locked and closed" is permissible when no occupants remain at the time the police are ready to depart, and evidence seen in plain view during the securing may likewise be seized.' "
W. LaFave, 2 Search and Seizure § 6.5(e) at 695-96 (2d ed. 1987). See also Thompson v. Louisiana, 469 U.S. 17,105 S.Ct. 409, 83 L.Ed.2d 246 (1984) ("Although the homicide investigators in this case may well have had probable cause to search the premises, it is undisputed that they did not obtain a warrant. Therefore, for the search to be valid, it must fall within one of the narrow and specifically delineated exceptions to the warrant requirement.").
We have found only one case in which the Alabama Supreme Court has had occasion to comment on Mincey, supra. In Ex parteUsrey, 527 So.2d 732 (Ala. 1987), remanding Usrey v. State,527 So.2d 725 (Ala.Cr.App. 1986), the defendant killed her husband inside their residence. The police were summoned to the residence, secured the scene, and determined that no unidentified person was present in the trailer. Thereafter, other officers arrived and conducted a warrantless four-hour search of the premises, "which involved opening closets and chests of drawers, and looking under clothes and beds." Usreyv. State, 527 So.2d at 727. "During this search, evidence was seized and photographs taken of the interior of the premises."Ex parte Usrey, 527 So.2d at 739. The Supreme Court remanded that case because the State failed to prove at trial that the evidence seized or photographed, and admitted over the defendant's objection, was found in plain view. Id. In so doing, the court noted:
 "Under the prevailing view, if the photographs admitted at trial depicted only items of scenes within the plain view of the officers, then the taking of the photographs did not constitute a search. 'The camera simply recorded what the officers saw' in plain view. State v. Dickerson, 313 N.W.2d 526, 532 (Iowa 1981); State v. Anderson, 42 Or. App. 29, 599 P.2d 1225 (1979)."
Ex parte Usrey, 527 So.2d at 739.
On remand to this court, the only evidence which the defendant argued was erroneously admitted was certain photographs taken during the search. This court found that those photographs depicted only the items within the plain view of initial officer on the scene and were properly *Page 1149 
ly admitted into evidence. Usrey v. State, 527 So.2d 741, 743
(Ala.Cr.App. 1988).
State v. Anderson, supra, was cited by our Supreme Court inEx parte Usrey, 527 So.2d at 739. Anderson held:
 "In the case here under review Detectives Lasater and Dickson arrived as part of the law enforcement agency's response to the shooting report [approximately three hours after the premises had been secured]. They, as the investigators in Michigan v. Tyler, [436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)], were not involved in the immediate emergency situation. Their purpose was to pictorially preserve the crime scene prior to the removal of the victim and to prevent accidental or intentional destruction of evidence. They needed no warrant to remain for these purposes. See State v. Eacret, 40 Or. App. 341, 595 P.2d 490 (1979). The officers photographed only what was in plain view. They conducted no search beyond looking at what was visible to their eyes. Because they were lawfully on the premises they could constitutionally seize items of evidence in plain view."
Anderson, 599 P.2d at 1229-30.
Anderson, supra, was also cited by the Supreme Court of Connecticut in its decision in State v. Magnano, 204 Conn. 259,528 A.2d 760 (1987). That court held that the photographs and measurements (the only evidence sought to be suppressed by the defendant) depicting the plain-view observations of the patrol officers who responded to the defendant's call that an intruder was in her house were admissible, although those photographs and measurements were taken by detectives who arrived on the scene 35 minutes after the patrol officers' initial entry and after the premises had been secured and any emergency had terminated. Because we find that court's analysis appropriate to this case, we set it out at length.
 "We conclude that when a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. Under such circumstances, it is permissible for the detectives to photograph and take measurements, without a search warrant, of evidence which was in the plain view of the initial responding officers. This conclusion is in conformity with decisions in other jurisdictions which have considered the issue, furthers the goal of effective law enforcement, and promotes the rationale and purpose of the plain view doctrine.
 "Our view of case law in other jurisdictions which have considered this issue in similar factual contexts lends overwhelming support to this conclusion. We note initially the ultimate disposition of Mincey v. Arizona, supra, on remand from the United States Supreme Court to the Arizona court. In Mincey v. Arizona, 130 Ariz. 389, 636 P.2d 637 (1981), several police officers staked out an apartment where a narcotics sale had been set up. The lead officer had previously been in the apartment in an undercover capacity and had arranged a drug sale. This officer rushed into Mincey's apartment and then into his bedroom. A volley of shots was heard. The other officers forced their way into the apartment and witnessed their brother officer emerge from the bedroom and collapse from a gunshot wound. He eventually died. The officers thereafter rushed into Mincey's bedroom where they found him, also suffering from gunshot wounds.
 "About ten minutes after the initial entry by the officers in response to the shooting, homicide detectives arrived and took charge of the investigation. Detective Reyna, two identification technicians and a graphic art specialist were among the group of law enforcement officers who entered the apartment. Without benefit of a search warrant, they began to photograph, film and diagram the contents of the apartment, but memorialized at that point only the plain view observations of the initial responding officers. Soon thereafter, all personnel left the *Page 1150 
apartment, but detectives returned some hours later to conduct a search which lasted for four days.
 "The defendant moved to suppress all evidence seized by Reyna. The Arizona Supreme Court held that Reyna's entry in response to the emergency was a continuation of the responding officers' original entry. The court stated: 'We also decline to separate, as appellant would have us do, the entry of Detective Reyna and the homicide squad from that of the [police officers] and further decline to find that their presence and activities were not part of the emergency. As has been stated the [police officers] were precluded from conducting their own investigation by police department policy. The evidence at the second trial showed also that Detective Reyna arrived and began his investigation only a short time after the shooting and while the [police officers] were still on the premises. . . . [W]e believe that Reyna's entry was merely a continuation of the initial emergency entry of the [police officers]. Reyna was, therefore, lawfully present during the emergency and could make plain view seizures during that time of evidence he observed in plain view.' Id., 401[, 636 P.2d 637].
 "In People v. Reynolds, 672 P.2d 529, 531 (Colo. 1983), another case that supports our conclusion, police officers responded to a call from the defendant's stepdaughter reporting that shots had been heard from the defendant's premises. When the officers arrived at the house, the defendant met them at the door and let them in. Thereafter, they located the body of the defendant's wife in a bedroom and arrested the defendant. The officers searched the rest of the house to determine if there were other victims or suspects. They observed in plain view an empty liquor bottle, a revolver and certain notes. One and one-half hours later, officers from the criminal investigation laboratory arrived to photograph and videotape these items and to take extensive measurements for preparation of diagrams of the murder scene.
 "The defendant moved to suppress the evidence, and the sole issue on appeal was remarkably similar to the issue in the present case, namely, whether the fourth amendment required the police to obtain a search warrant before they could photograph, videotape or diagram evidence otherwise admissible under the plain view exception. Id. The court held: 'A search warrant is not required where evidence discovered in plain view is seized as part of a continuing police investigation. . . . In our view, photographing the evidence, and recording the relevant crime scene dimensions approximately one hour and a half after discovery was part of an on-going lawful criminal investigation and did not require a search warrant.' Id., 533; see also State v. Johnson, 413 A.2d 931, 934 (Me. 1980), aff'd, 434 A.2d 532 (Me. 1981); Smith v. State, 419 So.2d 563, 568-74
(Miss. 1982); State v. Jolley, 312 N.C. 296, 321 S.E.2d 883, 886-87 (N.C. 1984); State v. Anderson, 42 Or. App. 29, 599 P.2d 1225, 1229 (1979), cert. denied, 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980); State v. Eacret, 40 Or. App. 341, 345, 595 P.2d 490 (1979); La Fournier v. State, 91 Wis.2d 61, 70, 280 N.W.2d 746 (1979). These cases establish the proposition that whether a subsequent entry is deemed to be detached from the initial emergency which justifies the warrantless intrusion or is a mere continuation of the intrusion depends on the facts and circumstances of each case. La Fournier v. State, supra.
 "In this case, the initial officers responded to the defendant's call that an intruder was in the house. During the course of the response they legitimately searched and secured the premises, observing items of evidence in plain view. Pursuant to department policy, they did not attempt to take any evidence into custody. The detectives arrived on the scene only thirty-five minutes after the responding officers' initial entry and while they were still on the premises. They proceeded to process evidence and to take photographs and measurements. Finally, the intruder was still unknown *Page 1151 
and at large, and the investigation had not focused on any particular individual. We conclude that under the facts of this case, the initial entry of the patrol officers and subsequent entry of the detectives were analytically inseparable, and that the later entry was a mere continuation of the earlier legal entry. As such, the photographs and measurements depicting the plain view observations of the patrol officers who had responded to the emergency were admissible.
 "This conclusion is also supported by sound policy and by fourth amendment theory. It is a reasonable and logical procedure for experienced law enforcement personnel to process evidence at crime scenes. The purpose is to promote careful preservation of evidence and to permit a complication-free chain of custody. The promotion of more accurate evidence gathering serves the legitimate interests of all parties. Our conclusion in this case serves to further this reasonable practice.
 "Furthermore, our conclusion is consistent with the rationale and purpose of the plain view doctrine. In Coolidge v. New Hampshire, 403 U.S. 443, 467-68, 91 S.Ct. 2022, 2038-39, 29 L.Ed.2d 564, reh. denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), the United States Supreme Court stated: 'Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous — to the evidence or to the police themselves — to require them to ignore it until they have obtained a warrant particularly describing it.' The same rationale applies to the claim that a search warrant is required to photograph evidence which is properly in plain view. Moreover, the defendant cannot be heard to complain that the second entry into the premises by the detectives affected her privacy interests. As the United States Supreme Court stated in Illinois v. Andreas, 463 U.S. 765, 772, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003
(1983), '[t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.' "
Magnano, 528 A.2d at 764-66 (footnote omitted).
This case should be analyzed under the reasoning of the courts in Usrey, supra, and Magnano, supra. Under those principles, in order to determine the admissibility of evidence, including tangible objects, photographs, and measurements, which was observed but not seized upon the initial entry of premises in response to an emergency situation, but was seized subsequently upon re-entry, the first question to be determined is whether the subsequent re-entry is detached from the initial emergency which justifies the warrantless intrusion or is a mere continuation of the initial intrusion. Magnano, 528 A.2d at 766. The second question which must be answered is whether the prosecution has carried its burden of proving that the evidence subsequently seized was within the plain view of the officer or officers who initially responded to the emergency situation and entered and secured the premises. Usrey, 527 So.2d at 739 and 742. If the subsequent re-entry was a mere continuation of the original legal entry of the responding officers, the officers on re-entry are "permitted to seize evidence and memorialize it by photographs and diagrams so long as it coincided with the plain view observations of the responding officers." Magnano,528 A.2d at 763.
The order of the circuit court dated November 18, 1988, granting the defendant's motion to suppress is hereby reversed. This case is remanded with directions that an evidentiary hearing be held applying legal principles not inconsistent with this opinion.
 II
At the suppression hearing, an investigator testified that he took certain measurements at the crime scene between 4:00 and 6:00 on the afternoon of December 7, 1987. The district attorney attempted to show *Page 1152 
that the investigator would have taken those same measurements the next day after obtaining the consent to search. However, the trial judge sustained the objection of defense counsel, and, after reviewing the case of Nix v. Williams, 467 U.S. 431,104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) stated, "I don't think this is on point at all."
In this ruling, the trial judge was in error. The inevitable discovery doctrine does apply to violations of the fourth amendment. See 4 LaFave at § 11.4(a) at p. 378 et seq.; UnitedStates v. Rodriguez, 869 F.2d 479, 485-86 (9th Cir. 1989) ("the absence of exigent circumstances, although rendering the warrantless entry of the premises unlawful, does not automatically render unlawful the act of securing the premises while a search warrant is being sought" and "[s]o long as the 'seizure' of the premises was supported by probable cause, and not otherwise unreasonable, items subsequently seized under the valid warrant are not directly excludable"); United States v. Townsley, 843 F.2d 1070, 1079 (8th Cir. 1988), cert. filed, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___ 1989 WL 116485 (May 30, 1989) ("When none of the evidence obtained in an initial illegal entry or seizure is used to obtain the warrant authorizing the subsequent entry or seizure, the valid warrant purges the evidence of any taint arising from the prior illegal activity."); United States v. Whitehorn, 813 F.2d 646, 649-50
(4th Cir. 1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898,101 L.Ed.2d 931 (1988) ("[T]he inevitable discovery rule may be applied even though the evidence validly obtained under a search warrant was previously uncovered in an illegal search."); United States v. Salgado, 807 F.2d 603, 609 (7th Cir. 1986), cert. denied, 487 U.S. 1233, 108 S.Ct. 2897,101 L.Ed.2d 931 (1988) ("the items that [the officer] saw and that later were seized pursuant to a valid warrant were admissible . . . even if [the officer] can be said to have 'seized' them by seeing them in the course of his search").
In this case, the State should be afforded the opportunity to show that this search was within the inevitable discovery rule. In showing that the inevitable discovery exception should apply, the State must carry the burden of proving by a preponderance of the evidence that the initial search or information gained therefrom was not used in any way to gain the defendant's consent, see United States v. Friewald,661 F. Supp. 559, 562 (C.D.Cal. 1987), and that the evidence and information discovered during the illegal search would ultimately or inevitably have been discovered by the lawful means of the consent search. In addition, the State must prove the voluntariness of the consent. See Schneckloth v.Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973);United States v. Watson, 423 U.S. 411, 96 S.Ct. 820,46 L.Ed.2d 598 (1976).
Therefore, in remanding this cause to the circuit court with directions that an evidentiary hearing be conducted, we point out that a determination should be made as to whether the State can satisfy the requirements of Nix v. Williams, supra. At the conclusion of that hearing, the circuit court is authorized to take whatever remedial action, if any, is appropriate with regard to this case. A transcript of that hearing shall be forwarded to this Court, along with the written findings of fact and conclusions of law of the trial judge.
APPLICATION FOR REHEARING GRANTED; MOTION DENIED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH DIRECTIONS.
All Judges concur. *Page 1153 
[EDITORS' NOTE: PAGE 1153 CONTAINS DECISIONS WITHOUT OPINIONS.]
 *Page 55