[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT, JAMES TO. LUDDY, SR.'S MOTIONTO DISMISS
DISCUSSION
This case involves an alleged conspiracy to sell a six week old baby.
On March 20, 1997, the state filed a five count amended information charging the baby's father, the defendant, James Timothy Luddy, Sr., with the following offenses: Count One
— Risk of injury to a minor in violation of General Statutes § 53-21 (1); Count Two — Conspiracy to Commit Risk of Injury to a Minor in violation of § 53-48 (a) and § 53-21 (1); Count Three — Intentionally making a false statement in violation of § 53a-157b (a); Count Four — Falsely reporting an incident in violation of § 53a-180 (a) (2), (a)(3)(A) and (a)(3)(B); and Count Five — Abandonment of a child under the age of six years in violation of § 53-23.[1]
On April 4, 1997, the defendant filed a motion to dismiss counts one, two and five, pursuant to General Statutes §54-56[2] and Practice Book § 815 (5), (8) and (9).[3]
The defendant claims that §§ 53-21 and 53-23 are unconstitutionally vague as applied to the facts set forth in the first, second and fifth counts of the amended information. The defendant further claims that there is insufficient evidence or cause to justify the bringing or continuing of such information or the placing of the defendant on trial in this case as to those charges.
On April 25, 1997, the defendant filed a memorandum of law in support of his motion. On May 23, 1997, the state filed a memorandum of law in opposition to the defendant's motion. The defendant filed a reply brief dated June 5, 1997. The attorney for the minor child, James Timothy Luddy, Jr., filed a memorandum of law in opposition on June 10, 1997. The defendant filed a reply brief dated June 30, 1997.
On June 10, 1997, the court heard oral argument on the defendant's motion to dismiss.
The parties have not stipulated to the facts. Nevertheless, the court has before it for consideration the record pleadings (the amended information and motion), along with written statements from James and Lynn Luddy,[4] and Carol Brooks,[5]
as well as the baby's hospital report.[6] See State v.Evans, 205 Conn. 528, 536-37, 534 A.2d 1159 (1987), cert. denied, 485 U.S. 988, 108, S.Ct. 1292, 99 L.Ed.2d 502 (1988). CT Page 11013 "On a motion to dismiss an information, the proffered proof is to be viewed most favorably to the state." State v.Morrill, 193 Conn. 602, 611, 478 A.2d 994 (1984).
In the first count of the amended information the state alleges that the defendant committed the offense of risk of injury to a minor in the town of Torrington. The state claims that the defendant on various dates in July and August of 1996,
 did wilfully cause and permit a child under the age of sixteen years, namely: James Timothy Luddy, Jr. (date of birth: July 11, 1996), to be placed in such a situation that the life or limb of such child was endangered, the health of such child was likely to be injured and the morals of such child were likely to be impaired and did an act likely to impair the health or morals of such child; specifically, that the [defendant] did agree with other, to wit: Jerry Petrovits, Carol Brooks and Lynn Luddy, to participate in the sale and delivery of the said James Timothy Luddy, Jr. to a person or persons unknown and that the [defendant] did transfer the said James Timothy Luddy, Jr. to Carol Brooks for the purpose of facilitating the sale and delivery of the said James Timothy Luddy, Jr. to a person or persons unknown, all in violation of Section 53-21 (1) of the Connecticut General Statutes.
In the second count the state alleges that the defendant committed the offense of conspiracy to commit risk of injury to a minor and
 charges that at the towns of Torrington, Goshen and Brookfield, on divers dates in July and August, 1996, the [defendant] with intent that conduct constituting a crime be performed, agreed with one or more person, including Lynn Luddy, Jerry Petrovits, and Carol Brooks, to engage in and cause the performance of such conduct, to wit: to wilfully cause and permit a child under the age of sixteen years, namely: James Timothy Luddy, Jr. (date of birth: July 11, 1996), to be placed in such a situation that the life or limb of such child be endangered, the health of such child be CT Page 11014 likely to be injured and the morals of such child be likely to be impaired and did an act likely to impair the health or morals of any such child, in violation of Section 53-21 (1) by way of Section 53a-48 (a) of the Connecticut General Statutes and one or more of the conspirators did commit one or more of the following overt acts in furtherance of the conspiracy, to wit: (1) on August 21, 1996, at Torrington, [the defendant] did deliver to Carol Brooks a child under the age of sixteen years, namely: James Timothy Luddy, Jr. (date of birth: July 11, 1996); (2) Carol Brooks and Jerry Petrovits did secrete said child in Torrington and Brookfield and New York state, (3) on August 21, 1996, [the defendant] and Lynn Luddy did falsely report to and give a written false statement to the Torrington police department claiming that the said child was missing, and (4) Jerry Petrovits did solicit Carol Brooks, and did organize and facilitate the secretion of said child for the purpose of its ultimate sale.
In the fifth count the state alleges that the defendant committed the offense of abandonment of a child under the age of six years and
 charges that at the city of Torrington, on the 21st day of August, 1996, in the area of the parking lot of 95 Highland Avenue, [the defendant] having charge of a child under the age of six years, namely: James Timothy Luddy, Jr. (date of birth: July 11, 1996), did expose such child in a place with intent to wholly abandon such child, in violation of Section 53-23 of the Connecticut General Statutes.
 I
The defendant claims that the first and second counts of the amended information should be dismissed because General Statutes § 53-21 (1),[7] as applied to the facts set forth in the amended information, violates the state[8] and federal due process clauses because the statute is unconstitutionally vague. In particular, the defendant claims that: (A) Neither the language of § 53-21 (1), nor judicial decisions interpreting CT Page 11015 it, provided fair warning that § 53-21 (1) proscribed his actions; (B) Reading § 53-21 (1) to include the selling of a baby invites jurors to base criminal liability on their own moral predilections and personal prejudices; and (C) The legislature's amendment of § 53-21, in direct response to this case, shows that even the legislature did not believe that § 53-21 (1) proscribed the defendant's actions.
In assessing whether a statute passes constitutional muster, courts "proceed from the well recognized jurisprudential principle that [t]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and [the court will] indulge in every presumption in favor of the statute's constitutionality. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited." (Citations omitted; internal quotation marks omitted.) State v. Payne, 240 Conn. 766, 777, 695 A.2d 525
(1997).
"For statutes that do not implicate the especially sensitive concerns embodied in the first amendment [or other fundamental rights], we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Citations omitted; internal quotation marks omitted.)State v. Payne, supra, 240 Conn. 777, 778. As our Appellate Court has recently held:
 . . . except for first amendment cases, an appropriate test of vagueness is whether the law as applied to the circumstances of the case creates doubt about the legality of the defendant's conduct. CT Page 11016
State v. Jason B., 47 Conn. App. 68, 78 (1997).
General Statutes § 53-21 (1) prohibits two general types of conduct: "(1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being." (Citation omitted.) State v. Dennis,150 Conn. 245, 250, 188 A.2d 65 (1963). In this case the state has charged the defendant conjuctively with both parts of § 53-21
(1). The second part of § 53-21 (1) is inapplicable, however, because the state has not alleged that any "acts" were directly perpetrated on the child.[9]
In recognition of this, the parties' have focused on the first part of § 53-21 (1).
 A
"[T]he terms of a penal statute . . . must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. . . . This notion of fair warning is intended to ensure that vague laws do not become a trap for the innocent." (Citations omitted; internal quotation marks omitted.) State v. Pickering, 180 Conn. 54, 60,428 A.2d 322 (1980).
"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v.Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d (903) 1983. "[A] law forbidding or requiring conduct in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. Baggett v. Bullitt, 377 U.S. 360,367, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); see State v.Indrisano, 228 Conn. 795, 802, 640 A.2d 986 (1994);State v. Schriver, 207 Conn. 456, 460, 542 A.2d 686
(1988)." State v. Jason B., supra, 76-77.
1 CT Page 11017
The first part of § 53-21 (1) provides in relevant part that "[a]ny person who . . . wilfully[10] or unlawfully[11]
causes or permits any child under the age of sixteen to be places in such a situation that the life or limb of such child is endangered, the health of such child is likely[12] to be injured or the morals of such child are likely to be impaired . . . shall be guilty of a class C felony." "The plain language of the first part of § 53-21 indicates the legislature's understanding that there is a broad class of intentional conduct that can put a child's well-being seriously at risk . . . ." State v. Payne, supra,240 Conn. 774.
Under the first part of § 53-21 (1), "it is not necessary to have any touching of any part of the body to violate § 53-21; the creation of a prohibited situation is sufficient." State v. Perrucciao, 192 Conn. 154,159-60, 471 A.2d 632, appeal dismissed, 469 U.S. 801,105 S.Ct. 55, 83 L.Ed.2d 6 (1984). Section 53-21 (1) does not list the "situations" that are prohibited. Id., 160. Due process does not require, however, that statutes "provide a laundry list of prohibited conduct. Laws may be general in nature so as to include a wide range of prohibited conduct. The constitution requires no more than a reasonable degree of certainty." (Brackets omitted; internal quotation marks omitted.)State v. Wilchinski, 242 Conn. 211, 224, ___ A.2d ___ (1997).
On its face, § 53-21 (1) prohibits a "situation" that endangers the life or limb of the child or is likely to injure the child's health or impair the morals of the child. General Statutes § 53-21. Thus, "the first part of § 53-21 [(1)] distinguish[es] three alternative classes of potential injury: endangering life or limb, likely injury to health, and impairment of morals." (Internal quotation marks omitted.) State v. Payne,
supra, 240 Conn. 772.
The phrase "life or limb of such child is endangered" refers to the legislature's intent to protect children from conduct creating a risk of physical injury. State v. Payne, supra,240 Conn. 772. See, e.g., State v. George, 37 Conn. App. 388, 391-92,656 A.2d 232 (1995) (leaving seventeen month old child unattended in apartment created situation risking injury to child's life or limb); State v. Jones, 29 Conn. App. 683, 688-89, 617 A.2d 918
(1992) (engaging in high-speed automobile pursuit and intentional CT Page 11018 crash with four year old child in auto created situation risking child's life or limb).
The phrase "the health of such child is likely to be injured" "encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible." State v. Payne, supra,240 Conn. 774. Health includes the child's mental health. See id., 772. See also State v. George, supra, 37 Conn. App. 391-92 (leaving seventeen moth old child unattended in apartment created situation risking injury to child's health); State v. Jones,
supra, 29 Conn. App. 688-89 (engaging in high-speed automobile pursuit and intentional crash with four year old child in auto created situation risking child's health).
The phrase "the morals of such child are likely to be impaired" refers to the legislature's intent to prohibit conduct threatening the morality of children. State v. Payne, supra,240 Conn. 772. See, e.g., State v. Tyler-Barcomb, 197 Conn. 666,668-69, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109,106 S.Ct. 1518, 89 L.Ed.2d 916 (1986) (morals likely to be impaired where mother fails to prevent boyfriend's sexual abuse of her twelve year old child and where she knowingly had sexual intercourse with boyfriend in presence of child); State v. Erzen,29 Conn. App. 591, 599, 617 A.2d 177 (1992) (exposing oneself to a child is an act likely to impair the morals of that child).
In State v. Erzen, supra, the Appellate Court rejected the defendant's argument that § 53-21 (1), as applied to him was vague and lacked specificity. The court observed that § 53-21
(1) "does not specify the `situations' deemed likely to impair the morals of a child." Id., 595. In analyzing the defendant's claim, the court looked to prior judicial decisions, other penal statutes and common sense to show that the defendant had fair warning that exposing oneself to a child created a situation that would impair the morals of a minor. Id.
2
The defendant cites to three cases as examples of "situations" proscribed by § 53-21 (1). See State v. PaulinoDumlao, 3 Conn. App. 607, 619-20, 491 A.2d 404 (1985) (defendant father convicted for failing to act when his child was physically abused); State v. Smith, 149 Conn. 487, 490, 181 A.2d 446 (1962) (defendant, without permission took boy to live with him and CT Page 11019 other men and exposed him to drinking parties and various sexual acts); State v. Tyler-Barcomb, supra, 197 Conn. 668-69 (mother failed to prevent boyfriend's sexual abuse of her twelve year old child and knowingly had sexual intercourse with boyfriend in presence of child).
The defendant argues that selling a baby is unlike the above cases because no reason exist to believe that the baby would not be well cared for by either Brooks, who held herself out as a nurse, or the person(s) to whom he would eventually be sold. The defendant notes that the hospital examination of the baby after he was found indicated that the baby was in good health. The defendant argues that "[e]ven if one considers the conduct of parents who would sell their baby to be reprehensible, there is still no danger to the baby." (See Memorandum in Support of Defendant's Motion to Dismiss, p. 9).
"[I]njury is not an element of the offense . . ." of risk of injury to a minor. State v. Apostle, 8 Conn. App. 216, 243,512 A.2d 947 (1986). "`The gist of General Statutes § 53-21 is not conduct which results in the actual impairment of morals [or injury to health]. . . . Rather, the gist is conduct which is likely to impair the morals [or injure the health] of a child under the age of sixteen.'" (Emphasis in original.) State v.Cutro, 37 Conn. App. 534, 542, 657 A.2d 239 (1995), quoting Statev. Sullivan, 11 Conn. App. 80, 91, 525 A.2d 1353 (1987). "[T]he creation of a prohibited situation is sufficient." (Internal quotation marks omitted.) State v. Perruccio, supra,192 Conn. 160.
The state argues that the defendant is guilty of creating a prohibited situation in several respects. First, in transferring his child to Carol Brooks, the defendant "placed his son in a situation inimical to his physical health by allowing him to ride in a car of questionable safety without a car seat to restrain him." Second, "[t]he defendant further endangered the physical, mental and moral health of his child by leaving him in the care and custody of a woman whom both he and the baby barely knew. . . . Further, her involvement in this covert plan to sell the child, and her failure to adequately prepare for her receipt of the child, (i.e., she had no car seat or baby supplies), leads to a reasonable conclusion that the baby would potentially suffer grave injury to his moral, physical and psychological health while in her care." Third, "the defendant conspired to, and did, barter his child for value. In so doing, he placed the baby into CT Page 11020 the stream of commerce, oblivious to its final destination."[13]
(See State's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, pp. 10-11.)
No judicial decision has directly interpreted the first part of General Statutes § 53-21 (1) to proscribe the alleged "situation" that the state argues the defendant created. Conversely, no case law exists suggesting that the defendant's alleged conduct was lawful. In fact, in State v. George, supra,37 Conn. App. 391-92, the Appellate Court held that § 53-21
proscribed the leaving of a 17 month old child unattended in an apartment because such conduct created a situation risking injury to the child's health and life or limb. In this case, the state effectively alleges that the defendant's actions constitute an unlawful abandonment of his child in that the defendant transferred his child to Carol Brooks for the purpose of facilitating the sale and delivery of the child to "a person or persons unknown. . . ." See Barwin v. Reidy, 307 P.2d 175, 184
(N.M. 1957) (finding that "the act of selling children constitutes abandonment of them as a matter of law. In fact, we can think of no more drastic way in which children could be abandoned, unless it be simply to leave them alone and exposed to the elements.")
Therefore, State v. George, supra, provided the defendant with some measure of fair warning that § 53-21 (1) proscribed his actions.
The defendant also argues that nearly all of the judicial decisions interpreting the risk of injury statute are predicated on another recognized criminal act, i.e., risk and sexual assault; risk and assault; risk and coercion; risk and reckless driving; the implication being that the facts in this case are not predicated on another recognized criminal act. The defendant's argument is not persuasive for several reasons. First, the language of § 53-21 (1) does not require that a prosecution under the risk of injury statute have as its basis another recognized criminal act. Second, under the alleged facts of this case, the defendant may be guilty of not only risk of injury to a minor, but also other criminal acts, such as abandonment; see General Statutes § 53-23; and circumventing Connecticut's strict adoption procedures. See General Statutes § 45a-729.
3 CT Page 11021
Courts may look to other penal statutes to provide fair warning of what situations § 53-21 (1) proscribes. Sue Statev. Erzen, supra, 29 Conn. App. 595. In particular, the Connecticut Supreme Court has recognized the desirability of reconciling the scope of § 53-21 with similar provisions of the penal code. See General Statutes § 53a-2.[14] See alsoState v. Schriver, supra, 207 Conn. 463 n. 4. No provision within the "penal code" appears, however, explicitly, to provide fair warning that § 53-21 (1) proscribes the sale of a baby.
Nevertheless, in recognition of the principle that courts should interpret statutes, where possible, to create a consistent body of law; see State v. Schriver, supra, 207 Conn. 463 n. 4; a related penal statute, even outside title 53a, may provide fair warning of what situations § 53-21 (1) proscribes. See In reJuvenile Appeal (83-CD), 189 Conn. 276, 288-89, 455 A.2d 1313
(1983) (construing statutes on a particular subject together even where legislature chose to place related laws in different parts of the General Statutes). See also Grayned v. City of Rockford,408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (noting that a court may look at analogous legislation to find that a statute provides fair warning); United States v. Lambert,446 F. Sup. 890, 896 (D. Conn. 1978, aff'd United States v.Girard, 601 F.2d 69 (1978), cert. denied, 444 U.S. 871,100 S.Ct. 148 (1979) (same); 2A Sutherland, Statutory Construction (4th Rev. Ed. 1984) § 51.03. See generally E. Peters, Common Law Judging in a Statutory World, 43 U. Pitt. L. Rev. 995 (1982). General Statutes § 45a-729, which makes it a felony to circumvent Connecticut's strict adoption requirements, is such a statute.[15] Sections 53-21 and 45a-729 share a core purpose — protecting a child's welfare.[16]
The purpose of Connecticut's strict adoption statutes is to protect the welfare of children, specifically by preventing the potential for "black market babies." See In re Baby Z,45 Conn. Sup. 33, 41, ___ A.2d ___ (1996). Similarly, the purpose of the risk of injury statute "is to protect the physical and psychological well-being of children from the potentially harmful conduct of adults." State v. Payne, supra, 240 Conn. 771.
Connecticut's adoption statutes and in particular General Statutes § 45a-729 provided the defendant with some measure of fair warning the § 53-21 (1) proscribed the "situation" he allegedly helped to create. CT Page 11022
4
In determining whether a statute provides fair warning, courts "also look to see whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." State v. Erzen, supra,29 Conn. App. 594. This Court believes that a person of common sense and ordinary intelligence, would reasonably know that a parent who gives up a six week old baby to a virtual stranger, for ultimate sale and delivery to an unknown person, without any reliable information concerning the competence of the persons in this entire chain of custody to protect the life and health of the infant child, is, by so doing, placing that child in a life endangering situation, and in a situation in which his health was likely to be injured.
The defendant argues that section 53-21 does not prohibit the selling of a baby. The State has not charge the defendant just with the sale of a baby, but rather with conduct, which, although intended to result in the eventual sale of the baby, also placed the child in a life or limb endangering situation and in a situation in which his health was likely to be injured.
The language of Section 53-21, as applied to the alleged facts, is sufficiently definite to establish minimal guidelines and give fair warning of what conduct must be avoided. The meaning of this statute can be fairly ascertained.
The state alleges in its amended information that the defendant "did transfer the said James Timothy Luddy, Jr. to Carol Brooks for the purpose of facilitating the sale and delivery of the said James Timothy Luddy, Jr. to a person orpersons unknown . . . ." (Emphasis added.) A person of ordinary intelligence would reasonably know by the use of his or her common sense and ordinary understanding that putting a child into the "stream of commerce" without taking any safeguards and without any knowledge of the parties involved poses a likely risk of injury to the child.
In fact, the state's allegations indicate that the defendant exhibited concern about the criminality of his actions by giving a false statement to the police regarding the nature of the incident. The defendant reported to the police that his six week CT Page 11023 old child was missing when allegedly he had already intentionally put the child into the "stream of commerce."
"[T]he fundamental purpose of the void for vagueness doctrine is to ensure fair warning in order to avoid traps for the innocent." State v. Payne, supra, 240 Conn. 779. Like the defendant in Payne, the defendant in the present case "has made no plausible argument, nor can [the court] conceive of one, that he acted in reliance on the belief that his conduct was lawful, or that a person of ordinary intelligence would have no reason to know that he was engaging in prohibited conduct." Id.
In sum, the language of the first part of § 53-21 (1), interpreted in light of its purpose, judicial decisions, other penal statutes, and common sense provided a person with fair warning that the alleged actions were proscribed by the first part of § 53-21 (1).
 B
The defendant notes that the second requirement of the vagueness doctrine is that a criminal statute must protect against standardless enforcement by officers, judges and juries. In particular, the defendant claims that reading § 53-21 (1) to include the selling of a baby invites jurors to base criminal liability on their own moral predilections and personal prejudices.
The Connecticut Supreme Court has observed that "[a]ll the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden. . . . Thus, a penal statute may survive a vagueness attack solely upon a consideration of whether it provides fair warning." (Citations omitted; internal quotation marks omitted.)State v. Pickering, supra, 180 Conn. 61. See also State v.George, supra, 37 Conn. App. 390 n. 2. Because the court has already determined that the first part of § 53-21 (1) provided the defendant with fair warning that his conduct was proscribed, the court need not reach the second requirement of the vagueness doctrine.
Moreover, our appellate courts have recognized that "[t]he common sense of the community as represented by . . . the jury, as well as the sense of decency, propriety and morality which most people entertain is sufficient to apply the statute to any CT Page 11024 particular case." State v. Payne, 40 Conn. App. 1, 13-14,669 A.2d 582 (1995), aff'd, 240 Conn. 766, 695 A.2d 525 (1997). The common sense of the community is an appropriate standard for a jury to apply in order to distinguish innocuous conduct from conduct that would violate the first prong of § 53-21 (1). Id.
Furthermore, Section 53-21(1), as discussed above is sufficiently definite to guard against arbitrary and discriminatory enforcement. It does not contain terms so vague that people of common intelligence are required to guess what it means or to differ as to its application. See State v. Jason B.,
supra, pages 76-77 (1997).
 C
During the pendency of this case the Connecticut legislature proposed several bills explicitly prohibiting the sale of children. See House Bill No. 5410; Substitute House Bill No. 5061. One of these bills, Substitute House Bill No. 5061, is now law — Public Act 97-147. Public Act No. 97-147, entitled "An Act Concerning Baby Selling and Falsely Reporting an Incident," adds subdivision (3) to § 53-21. Subdivision (3) provides:
 Any person who . . . (3) permanently transfers the legal or physical custody of a child under the age of sixteen years to another person for money or other valuable consideration or acquires or receives the legal or physical custody of a child under the age of sixteen years from another person upon payment of money or other valuable consideration to such other person or a third person, except in connection with an adoption proceeding that complies with the provisions of chapter 803, shall be guilty of a class C felony.
The defendant argues that the passing of the new 1997 public act shows that the legislature did not believe that on August 21, 1996, it was a criminal offense for parents to sell their baby. The defendant claims that the legislature, in reacting to this case, took steps to criminalize the conduct alleged here and to give notice that the alleged activity is in fact illegal. In essence, the defendant argues that P.A. 97-147 is a curative act. CT Page 11025
The state claims that the legislature has now explicitly proscribed that which the risk of injury statute already implicitly proscribed. The state claims that the legislature acted immediately to remedy an ambiguity. In essence, the state argues that P.A. 97-147 is a clarifying act.
Before addressing this issue, the court reiterates what it has already stated in this Memorandum of Decision, supra, "the State has not charged the defendant just with the sale of a baby, but rather with conduct, which, although intended to result in the eventual sale of the baby, also placed the child in a life or limb endangering situation, and in a situation in which his health was likely to be injured." Therefore, even if P.A. 97-147
were a curative act, dismissal of Counts One and Two would not be required.
"In determining the effect of a subsequent statutory amendment on earlier legislation, [the court is] guided by well defined principles of statutory interpretation. [The court recognizes] the usual presumption that, in enacting a statute, the legislature intended a change in existing law. . . . This presumption, however, like any other, may be rebutted by contrary evidence of the legislative intent in the particular case." (Citations omitted; internal quotation marks omitted.) State v.Magnano, 204 Conn. 259, 277, 528 A.2d 760 (1987).
"In determining the intended effect of a later enactment on earlier legislation, two questions must be asked. "First, was the act intended to clarify existing law or to change it? Second, if the act was intended to make a change, was the change intended to operate retroactively?" (Emphasis in original; internal quotation marks omitted.) State v. Magnano, supra, 204 Conn. 277.
"In order to determine whether an act should be characterized as clarifying legislation, [the court looks] to the legislative history to determine the legislative intent." State v. Magnano,
supra, 204 Conn. 278. The legislative history of P.A. 97-147
reveals conflicting commentary regarding whether the legislature intended the act to clarify existing law or to change it.
Representative Ward's comments support the state's view that the act merely makes explicit in the risk of injury statute what was already implicit. According to Rep. Ward:
The fact that in this day and age someone CT Page 11026 would seek to sell a child and we don't have it absolutely clear in our statutes that it is a significant felony with significant penalties is a mistake in our law. . . . I can't think of anything that would be more of a risk of injury situation than the truly heinous act of trying to transfer ownership of a child in exchange for cash.
(Emphasis added.) 40 H.R. Proc., Pt. 7, 1997 Sess., p. 2370-71.
In contrast, Representative Matiello's comments support the defendant's view that the act is curative in nature, i.e., that the legislature was closing a loophole in the law. According to Rep. Matiello:
 It's unfortunate that we have to deal with an issue such as this. . . . Equally bizarre is the fact that our statutes didn't address baby selling, that anyone contemplating selling of a baby is just simply bizarre.
40 H.R. Proc., supra, p. 2372-74.
In discussing the present case in his comments, Rep. Matiello added:
 The criminal trial continues and our prosecutors are working hard to determine in this case what is the appropriate criminal penalty.
 However, they have expressed to us from the very beginning, the police and the police department has as well, a frustration that Connecticut law simply is not addressing what is a bizarre, a bizarre situation — the selling of a child. The unfortunate truth is that no Connecticut law criminalizes this for transferring the custody of a child for money or other consideration.
(Emphasis added.) 40 H.R. Proc., supra, p. 2375.
In light of the above, the legislative history is not definitive as to whether P.A. 97-147 was intended to be a clarifying or curative act. The surrounding circumstances of the CT Page 11027 enactment of P.A. 97-147, however, suggest that the legislative enactment of P.A. 97-147 merely makes explicit in § 53-21 (3) what was already implicit in the first part of § 53-21 (1).
First, the legislature's enactment of P.A. 97-147 in direct response to this case invokes the principle of statutory construction that "[i]f the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment was a legislative interpretation of the original act." (Internal quotation marks omitted.) State v. Blasko, 202 Conn. 541, 558, 522 A.2d 753
(1987).
Because the penal code did not explicitly proscribe the defendant's selling of his son to an unknown party, the legislature saw the need to make it absolutely clear that selling a child constitutes a risk of injury situation. There is no dispute that the language of the first part of § 53-21 is wide in scope. Our Supreme Court has recognized that "[t]he plain language of the first part of § 53-21 indicated the legislature's understanding that there is a broad class of intentional conduct that can put a child's well-being seriously at risk. . . ." State v. Payne, supra, 240 Conn. 774.
Second, the legislature's prior amendment of § 53-21 by enacting P.A. 95-142, § 1, is an example of the legislature making explicit what was already implicit in the broad language of § 53-21 (1). Public Act 95-142, codified as § 53-21
(2) specifically prohibits contact with the intimate parts of minor in a sexual and indecent manner. Prior to the enactment, our Supreme Court held that the broad language of the second part of § 53-21 (1) proscribed such behavior. See State v.Pickering, supra, 180 Conn. 64.
Similarly, in this case the legislature is making explicit in § 53-21 (3) what was already implicit in the first part of § 53-21 (1).
In conclusion, the defendant has failed to prove beyond a reasonable doubt that the first part of § 53-21 (1) is unconstitutionally vague as applied to the facts alleged in the amended information.
II CT Page 11028
The defendant also claims that the first and second counts of the state's amended information should be dismissed for insufficiency of evidence or cause.
As a threshold issue, the state argues that the defendant's claims of insufficient evidence and insufficient cause should not be addressed as a pretrial matter. The state claims that the insufficient evidence claim is inappropriate because the state anticipates producing more evidence at trial. The state claims that the court should not consider the insufficient cause claim until at least one trial has occurred. In support of its position, the state relies on State v. Bellamy,4 Conn. App. 520, 495 A.2d 724 (1985) and State v. Dills, 19 Conn. App. 495,563 A.2d 733 (1989).
The court will address the defendant's pretrial claims of insufficient evidence and insufficient cause for the following reasons. First, as the defendant points out, Bellamy and Dills
involved arrests pursuant to a warrant, whereas the present case involves a warrantless arrest. Second, both General Statutes § 54-56 and Practice Book § 815 (5) allow defendants to move for dismissal based on insufficient evidence or insufficient cause. Third, Practice Book § 816, which precludes a defendant from moving for dismissal under § 815 (5) in certain situations does not apply to the present case.
The state has indicated that it intends to rely on Carol Brooks' statement regarding the present case. The substance of her statement provides that:
As of August 1996, Brooks knew Jerry Petrovits for approximately two months. In June of 1996, Petrovits had posted $4,600 in bond money at the Bantam Court for Brooks because of criminal charges pending against her. Brooks agreed to pay Petrovits back later. Brooks began a relationship with Petrovits.
During the course of their relationship, Petrovits told her about the Luddys and how they could not take care of their baby because both used drugs and could not afford the baby. Petrovits told her that the baby did not look good at two weeks and how the Luddys did not want him. Petrovits asked her to take care of the baby because she was a nurse. One day, Brooks, Petrovits and the Luddys met outside Petrovits' store, above which the Luddys lived, and they told her that after giving up the baby they would CT Page 11029 make up some story to tell the police. Brooks felt sad because the baby did not look well. Petrovits told her that she would only have to keep the baby for a couple of weeks until things cooled down and then the baby could be sold to one of Petrovits' friends out of state. The Luddys never mentioned anything about money.
On Friday, August 21, 1996 at approximately 6:35 p. m. Brooks drove to the store on Highland Ave. where the defendant was outside holding the baby. The defendant placed the baby in the car and walked away. She drove to Brookfield and then to "Pawling, New York" with the baby. On August 22, 1996 she drove to Danbury with the baby and purchased a car seat, stroller and clothes from a consignment shop. She also purchased formula and toys for the baby. Brooks also stated that she had stolen a registration plate to avoid detection by the police. Brooks claimed that she was going to drop the baby off at a church or facility, but decided to turn herself in.
Brooks stated that Petrovits gave her $1,000 for day care costs and forgave the $2,600 debt she owed him for paying her bond. Brooks also admitted that she knew that the Luddys were going to tell the police that the baby had been kidnapped. She was not sure how much the Luddys were going to get for selling the baby. Moreover, she was not sure who was buying the baby, but stated that Petrovits hinted it may be his sister who lives in Maryland.
The defendant claims that Brooks is not a reliable witness because she has an extensive criminal record and has used numerous aliases. Moreover, according to the defendant, Brooks' statement is contradictory. While this may be true, the defendant can raise any inconsistencies at trial on cross examination. Also, even if Brooks later recants part or all of her statement, its contents may be admissible, not only to impeach her, but also to establish the truth of the statement, under State v. Whelan,200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994,107 S.Ct. 597, 93 L.Ed.2d 598 (1986). Furthermore, a conviction can rest on an inconsistent statement that satisfies the requirements of Whelan. See State v. Newsome,238 Conn. 588, 622, 682 A.2d 972 (1996). In addition, the state has not conceded that the evidence presently before the court will constitute its entire proof at trial. See State v. Bellamy,
supra, 4 Conn. App. 527-28. Furthermore, it's up to the jury to decide whether Carol Brooks or any other witness is telling the CT Page 11030 truth.
In viewing the "proffered proof" in the light most favorable to the state, the state has proffered sufficient evidence at this time to avoid dismissal of the first and second counts of the amended information because of insufficiency of the evidence.
With regard to the defendant's claim that Counts One and Two should be dismissed because of insufficiency of cause, the court must weigh and balance the competing interests involved in a determination of fundamental fairness, and concludes that it cannot properly form such a judgment before trial, and therefore the Motion To Dismiss on this ground is denied.
Based on the same reasoning, the Motion To Dismiss Count Five for insufficiency of cause is denied.
 III
The defendant also claims that there is insufficient evidence or cause to justify the bringing or continuing of such information or the placing of the defendant on trial for the charge of abandonment of a child under the age of six years pursuant to General Statutes § 53-23.
General Statutes § 53-23 provides: "Any person having the charge of any child under the age of six years who exposes it in any place, with the intent wholly to abandon it, shall be fined not more than five hundred dollars and imprisoned not more than five years." There are no reported cases discussing § 53-23.
The defendant claims that there is no information that the defendant ever "exposed" his child for any purpose.
In analyzing § 53-23, the court's "fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, [the court looks] to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) State v. Payne, supra, 240 Conn. 770-71.
Section 53-23 does not define the term "expose," and the CT Page 11031 legislative history does not provide any insight into the legislature's intent in using that term. "If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) State v. Payne, supra, 240 Conn. 771.
The defendant refers in his brief to the definition of expose set forth in Ballentine's Law Dictionary, which provides that expose means "to leave unprotected." The defendant argues that even if the alleged facts in this case are true, the defendant never left his child unprotected. The defendant claims that the child was never "exposed" because the defendant simply placed his son in Carol Brooks's car and allowed her to take possession of him.[17]
Under the definition of expose that the defendant uses in his own brief, the defendant's alleged actions, if true, could lead reasonable jurors to find that the defendant left his child unprotected. First, it is apparent from Brooks' statement that the defendant put his son in the car without a child seat in violation of General Statutes § 14-100a (d). Second, the defendant gave the child to Brooks, a woman who, according to here own statement, was not prepared to care for a child. Third, the defendant had no reliable information concerning her ability to care for and protect the baby. Fourth, using brooks as a conduit, the defendant placed his son into the stream of commerce, oblivious to the child's final destination.
In construing the alleged facts most favorably to the state, the state has proffered sufficient evidence at this time to avoid dismissal of the fifth count of the amended information.[18]
 IV
The defendant also claims that § 53-23 is vague as applied to the facts alleged in the state's amended information because there are no prior cases or judicial gloss providing a workable standard for § 53-23.
Although there are no reported cases discussing § 53-23, the plain language of the abandonment statute provides fair warning of what the statute proscribes. Section 53-23 provides in relevant part that "[a]ny person having the charge of any child under the age of six years who exposes it in any place, with the CT Page 11032 intent wholly to abandon it. . . ." shall be punished. The defendant focuses on the term "exposes." As discussed above, "expose" means "to leave unprotected." See Ballentine's Law Dictionary (3rd Ed. 1969) p. 440.
In addition, the dictionary meaning of "abandon" is "[t]o withdraw one's support or help from, esp. in spite of a duty, allegiance, or responsibility; desert." See The American Heritage Dictionary (2nd College Ed. 1985) p. 66. Furthermore, as the state points out, our case law readily defines the term "abandon" in the context of the termination of parental rights. See General Statutes § 17a-112 (c) (A); In re Migdalia M.,6 Conn. App. 194, 209, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986).
In light of the common and legal meanings of "expose" and "abandon", a person of ordinary intelligence would know from the language of General Statutes § 53-23 that it proscribes "the placing of a baby into the stream of commerce." Furthermore, the defendant in the present case "has made no plausible argument, nor can [the court] conceive of one, that he acted in reliance on the belief that his conduct was lawful, or that a person of ordinary intelligence would have no reason to know that he was engaging in prohibited conduct." State v. Payne, supra,240 Conn. 779.
In conclusion, the defendant has failed to prove beyond a reasonable doubt that General Statutes § 53-23 is unconstitutionally vague as applied to the facts alleged in the amended information.
CONCLUSION
Based on the foregoing reasons, the defendant's motion to dismiss the first, second and fifth counts of the state's amended information dated March 20, 1997 is denied.
HON. RICHARD A. WALSH, J.